| 16 | 11 |
| 80 | 225 |
| 80 | 227 |

| 16 | 11 |
| 81 | 486 |
| 81 | 487 |

| 16 | 11 |
| 84 | 59 |

| 16 | 11 |
| 106 | 116 |

| 16 | 11 |
| 112 | 168 |

---

## THE PEOPLE ex rel. McCAULEY and TEVIS v. SAMUEL H. BROOKS, Controller of State.

*State of California* v. *McCauley,* (15 Cal. 429) deciding the Act of March 26th, 1856, appointing a Board of State Prison Commissioners, to be constitutional, and the contract entered into by said Board, in behalf of the State, with Estill, and the assignment thereof to McCauley, to be valid and binding upon the State, affirmed.

A contract entered into by the agents of the State, upon a subject within the constitutional control of the Legislature, may be affirmed by the State by legislation, indirectly referring to the contract, or proceeding upon its assumed validity. Direct legislative action, in terms designating and affirming the contract, is not necessary.

In the Act of April 7th, 1856, appropriating moneys to defray the expenses of the prison up to March 28th, passed after a copy of the contract with Estill had been transmitted to the Senate, the Legislature recognized the existence, and in effect, the validity of the contract, in the provision that no person should receive any pay for supplies furnished under any contract with the directors of the prison, until he surrendered such contract and released the State from all liability for such supplies "furnished *after the leasing* of said prison by the Board of Commissioners, under an act passed at this session of the Legislature."

To an appropriation within the meaning of the Constitution, nothing more is requisite than a designation of the amount, and the fund out of which it shall be paid. It is not essential to its validity, that funds to meet the same should be at the time in the treasury.

McCauley *v.* Brooks.

The provision in the Constitution, that "no money shall be drawn from the treasury, but in consequence of appropriations made by law," means only that no money shall be drawn, except in pursuance of law.

The Act of April 13th, 1859, amendatory of the act concerning the office of Controller, and providing that no warrants shall be drawn, except there be "an unexhausted, specific appropriation" to meet the same, means only that the Controller shall not draw a warrant for a specific object, when he has already drawn for the full amount of the appropriation made for that object; and this act does not qualify the right of Estill, or those representing him, to warrants for the monthly installments, as they respectively become due, under the contract between him and the State, relative to the State prison and its convicts.

The ninth section of the Act of April 16th, 1856, requiring that demands against the State, except for the salaries of officers, must receive the approval of the Board of Examiners before warrants can be issued for them by the Controller, and the Act of April 21st, 1858, creating a Board of Examiners, embrace within their terms the claim of relators; but as to such claim, these acts are unconstitutional and void, because impairing the obligation of the contract. The law under which the contract was made, and to which it in terms refers, gives an absolute right to the warrants for the monthly installments as they become due, and directs the Treasurer to pay them; and this absolute right to the warrants cannot be changed, by any subsequent legislative enactment, into a right dependent for its enjoyment upon the will and discretion of any Board established by the State.

These acts, as to the Board of Examiners, do not affect the remedy simply; but if they did relate to the remedy only, they so change the remedy as to impair the right; and legislation, producing this result, is as much within the inhibition of the Constitution, as if it directly assailed the right.

*Robinson* v. *Magee* (9 Cal. 81) cited.

The contract between Estill and the State was not affected by the Act of April 19th, 1859, repealing the Act of March 26th, 1856, under which the contract was made. The contract remained after the extinction by repeal of its parent act, possessed of the same binding force as before. The rights of the parties and their respective obligations became fixed by the contract, beyond the reach of legislative power; they were vested interests.

The Legislature possesses the entire control and management of the financial affairs of the State. It can levy such taxes as it may deem expedient, subject only to the constitutional requirements of equality and uniformity, and devote the proceeds of the taxation to such specific objects as it may think proper. But, after having made an appropriation, in view of a contemplated contract to be based thereon, and such contract is made, and funds to meet the appropriation are received into the treasury, it cannot deprive the party with whom the contract is entered into of such funds by repealing the appropriation. In other words, the control of the Legislature over particular funds, when received, may be subject to the obligations of a contract made with reference to them. By such contract, the Legislature does not derogate from its own power, or that of any subsequent Legislature. It only acts finally upon a particular subject, which is thus placed beyond the reach of future action. It is true, the Legisla-

McCauley *v.* Brooks.

ture may not direct any taxation, may repeal all laws relating to the collection of the revenue, and thus prevent the receipt of any funds upon which the appropriation can operate; but this possibility does not affect the right of the parties when such funds are actually received.

*McDonald* v. *Griswold,* (4 Cal. 352) *McDonald* v. *Maddux,* (11 Id. 187) *People* v. *Bond,* (10 Id. 566) commented on and approved.

The contract between Estill and the State, from its terms, is incapable of apportionment, and the measure of damages for a breach of it, is the sum fixed by the contract itself; and the assignees of Estill—relators here—are entitled to the full sum of ten thousand dollars per month, including the period during which the lessee and his assignee were forcibly and unlawfully kept from the possession of the prison, under the Act of February 26th, 1858.

The contract between the State and Estill remaining obligatory, not qualified by any legislation, it was the duty of the Controller, upon demand of relators— assignees of Estill—to have issued warrants upon the Treasurer, for the sums claimed under the contract; and the performance of this can be enforced by mandamus.

The fourth article of our Constitution, distributing the powers of government into three departments—legislative, executive, and judicial—does not place either department above the law, nor make either independent of the other. These departments are not absolutely independent of each other, except in cases where discretion is vested in terms, or is necessarily implied from the nature of the duties to be performed; but there is no discretion where rights have vested under the Constitution, or by existing laws.

The Legislature can pass such laws as it may judge expedient, subject only to the prohibitions of the Constitution. If it overstep those limits, and attempt to impair the obligation of contracts, or to pass *ex post facto* laws, or grant special acts of incorporation for other than municipal purposes, the judiciary will set aside its legislation, and protect the rights it has assailed.

The Controller and Treasurer of State are no more officers of the executive department, than the Sheriffs and Tax Collectors of each county.

*Marbury* v. *Madison,* (1 Cr. 137) *Kendall* v. *The United States,* (12 Pet. 524) *Decatur* v. *Paulding,* (14 Id. 497) *United States* v. *Guthrie,* (17 How. 284) commented on.

Mandamus will issue to the Governor in certain cases.

Distinction, from political considerations, between the Governor and the inferior officers of the executive department, as to the issuance of this writ, stated.

*Fowler* v. *Pierce,* (2 Cal. 165) *People ex rel. McDougall* v. *Bell,* (4 Id. 177) *People* v. *Whitman,* (6 Id. 559) as to mandamus, cited.

The State can resume possession of the State prison and control of the convicts in one way only—by compensation, as is required in all cases where private property is taken for public use. The leasehold interest of Estill and his assignees is as much property, for which compensation is to be made before it can be subjected to the uses of the State, as are lands held in fee.

Any wrongs to the State, from mismanagement of the prison, or from disregard of the stipulations of the contract, must be redressed by proceeding upon the bond executed as security for the performance of the contract.

The contract only gives the right to have the warrants paid out of the moneys in

McCauley *v*. Brooks.

the treasury not otherwise appropriated.    When the warrants are presented to the Treasurer, it will be his duty to apply to them the unappropriated moneys in the treasury, and to continue to apply such moneys, as they are from time to time received, until the warrants are fully paid.

The State has no right to repudiate her debts.  She cannot be sued, and hence, demands against her must await the action of the Legislature in the appropriation of moneys for their payment.   In that sense, the Legislature possesses the power to postpone her general creditors indefinitely ; in that sense only can the State repudiate ; but the right and the power are not synonymous terms.

Where political power is vested in a public officer, he is responsible only in his political character to the country.    Where discretion is vested in him, he but conforms to the law in exercising that discretion.   But where a question of political power is not involved, where no discretion exists, but a specific, legal duty is imposed, ministerial in its character, such as the issuance of a patent, the delivery of a commission, the payment of a specific sum, or the drawing of a particular warrant, and in the performance of that duty individuals have a direct pecuniary interest, the officer, like any other citizen, is subject to the process of the regularly constituted tribunals of the country.

The Controller of the State is an officer of the executive department, but does not hold his appointment of the Governor, is not responsible to him, and acts entirely independent of him.   His duties are enumerated and defined by the law, and they are generally of a purely ministerial character.   He has no discretion as to the issuance of warrants for appropriations for the public service.

If the Controller be in doubt as to whether the law requires the issuance of warrants in a given case, he may ask the judgment of the Courts as to the law ; but the law being determined, it is his duty to yield obedience to it.       .

The Controller and Treasurer of State have no greater immunities from legal process, than the Auditors and Treasurers of counties.   The duties of each set are similar in their general nature.

Application to issue the mandamus directly from the Supreme Court, on reversal of the judgment below, instead of transmitting its judgment to the District Court, to be there enforced through     process, denied,—the Court being divided on the question.

Appeal from the Sixth District.

Application for mandamus to the Controller of State, to compel him to issue warrants claimed by relators under the State prison contract with Estill.   The facts appear in the opinion of the Court.   For the contract and the law under which it was made, see *State* v. *McCauley* (15 Cal. 431).

The Court below denied the writ.   Relators appeal.

*A. P. Crittenden and Tod Robinson,* for Appellants.

I.   Assuming that the Controller was lawfully required to issue the

warrants on demand of the relators, then he could be compelled by mandamus to issue them.

Formerly it was the practice to issue this writ to compel the performance only of duties which were purely ministerial, "but modern cases have gone much further, and it is now the constant practice to grant the writ to command the performance by any inferior jurisdiction or officer of any public duty for which there is no specific remedy." (Tapping on Mandamus, 12, and cases cited; *McDougall* v. *Bell,* 4 Cal. 177.) It will issue to compel the Secretary of State to deliver a commission. (*Marbury* v. *Madison,* 1 Cranch, 137.) Or against the Governor of a State to compel him to execute and deliver State bonds in pursuance of an act of the Legislature. (*Pacific R. R. Co.* v. *The Governor,* 23 Mo. 353.) Or compel him to do any ministerial act. (*Bonner* v. *Pitts,* 7 Georgia, 473.) Or against the Postmaster General to compel the performance of a ministerial act. (*Kendall* v. *United States,* 12 Peters, 524.) Or against the Speaker of the Assembly to compel him to audit the account of a member for his per diem. (*Ex parte Pickett,* 24 Ala. 91.) Or to compel a County Treasurer to pay the amount of an account which had been legally audited and allowed by the Board of Supervisors. (*People ex rel. Morris* v. *Edmonds,* 15 Barb. 529; *People ex rel. Stuart* v. *Edmonds,* 19 Id. 468; *People ex rel. Downing* v. *Stout,* 23 Id. 338; *Huff* v. *Knapp,* 1 Selden, 65.) To compel the Auditor of the Canal Department to pay a draft drawn upon him by a Canal Commissioner. (*People ex rel. Howard* v. *Newell,* 13 Barb. 86.) To compel Commissioners for loaning moneys of the United States to pay over surplus moneys in their hands. (*People ex rel. Kirkham* v. *Cotes et al.* 1 How. Pr. R. 160.) To compel the Controller to issue his warrant to pay certain tolls collected by him for the State. (*Smith* v. *Controller of State,* 18 Wend. 659.) To compel a City Controller to draw his warrants for moneys ordered to be paid by the corporation. (*People ex rel. Reynolds* v. *Flagg,* 16 Barb. 503.)

The cases establish the proposition that this writ is the proper remedy to compel corporations, subordinate tribunals and officers to perform duties imposed upon them by law. The office of the writ, when directed to subordinate judicial tribunals and officers, is to command them simply to proceed; but when directed to corporations and ministerial officers, it may not only compel them to act, but direct the mode and manner in which they shall act, and that they shall reverse what they have already done. (*People ex rel. Doughty* v. *Judges of Duchess C. P.* 20 Wend.

McCauley *v.* Brooks.

658; *People ex rel. Griffin* v. *Steele et als.* 2 Barb. 418; *Hull* v. *Supervisors of Oneida,* 19 Johns. 263; *Adriance* v. *Supervisors of N. Y.* 12 How. Pr. R. 224; *People ex rel. Rogers* v. *Co. Judge Clinton Co.* 13 Id. 277; *Danby* v. *Whitely,* 14 Ark. 687; 2 Id. 80; *Fowler* v. *Pierce,* 2 Cal. 165; 6 Id. 659.) Our statute is declaratory of the common law. (Practice Act, secs. 467, 468.)

In this case the amount to be paid is definitely ascertained by the contract, and the law for the appropriation of $15,000 per month, or such less sum as may be required, became, upon making the contract, an appropriation of $10,000, the less sum required, as determined by the contract. Imposing a limit, the law referred to the future contract for the designation of the precise sum. The amount named in the law was certain, because capable of being made so by the contract. Such a form of appropriation, that is, by naming a limit only, and even of so much money as may be necessary for a specified purpose without naming any limit, is not unusual. (Acts 1854, 31, 33, 36; Acts 1856, 135, 226, 81; Acts 1859, 308, 313.) And this appropriation for five years is free from any objection on account of the appropriation being for more than a year, for there is no constitutional injunction that appropriations shall be made from year to year, nor is it the invariable practice of the Legislature so to make them. (Acts 1856, 57; Acts 1856, 135; Acts 1858, 80.)

In the absence of any constitutional restriction, the power of the Legislature is unlimited. No Court has the right to declare an act of the Legislature void upon considerations of policy. (*People ex rel. Burgess* v. *Wilson,* 25 Illinois, 392, and cases cited; *People* v. *Saratoga and Rens. R. R. Co.* 15 Wend. 133; *People* v. *Morrell,* 21 Id. 576.) It is true that one Legislature cannot take away from a succeeding Legislature any of its power or capacity to act, but by its own action it may withdraw from Legislative control a particular subject matter, or create rights in reference to it which cannot be affected by any subsequent Legislature.

This is done when one Legislature disposes of property of the State, or makes any contract binding upon the State. A contract binds the Legislature that makes it, and all succeeding ones, because it imposes or creates an obligation which both the Constitutions of the United States and of the State protect, by declaring that no law shall be passed impairing it. (*Bloomer* v. *Stolley,* 5 McLean, 161.) As, for instance, if a State borrow money, and by the contract provide means for its pay-

McCauley *v.* Brooks.

ment and the payment of interest, and stipulate as to the time, place and mode of payment, no succeeding Legislature can reach and misapply the fund raised in accordance with the contract. A law attempting it would be unconstitutional and void, and the officer in whose hands the fund was could not obey it.

The proposition that a law which makes appropriations for a number of years in advance is void, is untenable.

The case of *Nichols* v. *The Controller* (4 Stewart and Porter, 154) is in point.

But applying the admitted principle laid down in 5 McLean, 161, all that can be said in respect to such an appropriation is that it will not bind a succceeding Legislature, and that a succeeding Legislature may repeal it; and that must be taken with the limitation, as clear as the principle itself, that the repeal shall not impair the obligation of a contract.

Not only is there a specific appropriation, but the time of payment is fixed by the contract and the law. The statute is conclusive on the Controller, and as completely divests him of all discretion as if the account had been allowed by an examining officer. He has nothing to do but to perform the ministerial duty of drawing his warrants at the times and for the amounts named in the law and the contract.

As to the objection that there is no "unexhausted specific appropriation" for the amount of the warrants demanded, according to the Act of 1854, the answer is—1st. There is in the treasury a portion of the amount; 2d. The Act of March 26, 1856, gives the right to the warrants unconditionally and independent of the fact whether there is money in the treasury to meet them or not; 3d. The Act of 1854 means only that the Controller shall not draw a warrant when he has already drawn the full amount of the appropriation. Appropriation is the designation of a sum for a particular purpose, and it is effectual and complete, whether the money is in the treasury or not. It is a lawful authority for the Treasurer to pay out so much when it comes to his hands. It never has happened, in the history of this State, that there was in the treasury, at the time of appropriation, all the money appropriated by the general appropriation act. And an appropriation is unexhausted when the Controller has not drawn to its full amount.

The Act of 1854, then, has no bearing on the case.

The Controller has no discretion in this matter. The statute says he shall, on demand, issue his warrants for a definite sum, at a fixed time,

to a person named.   Nor is he to pass on the validity of the contract, or of the assignments.   On their face the assignments passed the interest of Estill to McCauley and Tevis.

That the Court can issue a mandamus to the Controller, is established by the cases of *Kendall* v. *The United States*, (12 Peters, 524) and *Marling* v. *Madison*, (1 Cranch, 137).

This is not a suit against the State.   (*Nougues* v. *Douglas*, 7 Cal. 65;  *Osborne* v. *Bank of the United States*, 9 Wheat. 738.)

It is true, that by our Constitution our Government is divided into three departments, legislative, executive and judicial; and that no person charged with the exercise of powers properly belonging to one of these departments, can exercise any functions appertaining to either of the others.

These three departments are, and must be, in order that any government should exist, in a certain sense, independent of each other.   That is, each should be at liberty to exercise its own peculiar powers, free from control or dictation by any other in respect to the mode and manner of their exercise.   When either has a discretion, it must exercise it at its own will.   But there is no such thing as absolute independence of the different departments.

The judiciary is bound to apply the law which the Legislature makes, and the executive is bound to enforce that law.   Both the judiciary and the executive are therefore in one sense dependent upon the Legislature.

But in the right application of law to particular cases, the judiciary have the sole and exclusive right of determination, without regard to legislative will, or any expression of legislative opinion, and in the execution of the law, the executive must be governed by his own discretion in respect to the time and manner of his action, both departments acting under their responsibility to the law and the Constitution.

II.   Respondent contends that even though it be conceded that the State is liable to appellants, and that Courts may issue a mandamus to the Controller in a proper case, there is no legal duty on the Controller to issue these warrants.

1. It is contended that under the Acts of April 16th, 1856, and April 21st, 1858, the Controller is prohibited from drawing his warrants without the previous approval of the Board of Examiners.

To this we answer: 1. That these acts do not embrace this claim; 2. That if they are to be construed to embrace it, they are unconstitutional and void, so far as this claim is concerned.

McCauley v. Brooks.

The Act of April 16th, 1856, is to be construed, as all statutes are to be construed, to operate prospectively only, unless the contrary intention appears affirmatively.

So far from any such intention appearing, the act (see Acts of 1856, 100) in the ninth section declares that "whenever, hereafter, the Controller shall by law be directed to draw his warrant upon the Treasurer of the State for any purpose whatsoever, said direction shall be construed to be subject to the provisions of this act, etc."

This is equivalent to a declaration that whenever, heretofore, the Controller shall have been directed to draw his warrant, such direction shall be construed not to be subject to the provisions of this act.

The present case seems to be carefully excluded from the operation of the act. The direction to the Controller to draw his warrants in favor of the lessee, was given by the prior law of March 21st, 1856.

The Act of April 21st, 1858, sec. 5, (Acts of 1858, 212) is in the very same words as the Act of April 16th, 1856.

But if these acts do prohibit the Controller from drawing his warrants in favor of the lessee, unless the claim shall have been first submitted to, and approved by the Board of Examiners, they are void; because, if effect be given to them, they impair the obligation of the contract between the State and the lessee and his assigns.

The Act of March 21st, 1856, specifies the terms of the contemplated contract to be entered into between the State and the lessee. When the contract was made on the twenty-sixth of March, 1856, under the authority of that law, the law entered into and became a part of the contract. The contract not only refers to the law, but professes to express its exact terms, and in respect to the obligation of the State to make payment to the lessee, provides that the payment shall be made in the very manner specified in the seventh section of the act.

That section gives to the lessee, the absolute, unconditional right to demand and receive from the Controller, upon the expiration of each month, warrants for the sum named in the contract.

The acts creating the Board of Examiners, if applicable to this claim, would interpolate a new term in the contract, would take away the absolute right to the immediate receipt of the warrants, given by the law and the contract, and substitute a conditional right, to be enjoyed only at the will and discretion of a tribunal established by the State herself, and at such time as it might please that tribunal.

If this act affect the remedy merely, which we deny, it is still uncon-

McCauley *v.* Brooks.

stitutional.  ( *Green* v. *Biddle,* 8 Wheat. 1 ; *Bronson* v. *Kinne,* 1 How.
311 ; *McCracken* v. *Hayward,* 2 Id. 608 ; *Robinson* v. *Magee,* 9 Cal.
81 ; *People* v. *Bond,* 11 Id. 571.)

2. It is insisted on behalf of the respondent, that he cannot, in any
event, be compelled to draw his warrants according to the directions of
the Act of March 21st, 1856, because that act has been repealed by the
Act of April 19th, 1859, 374.

If it be beyond the power of the Legislature to impair the obligation
of the contract between the State and the lessee, as by inserting in it a
new condition, it is beyond its power to destroy that obligation altogether
by a positive enactment that the State should be no longer bound by the
contract.

The contract reserves to the State no right to terminate it at pleas-
ure, nor to alter its conditions. It is absolute for the term of five years.

Any repeal of the Act of March 21st, 1856, is ineffectual, for the
appellants do not claim under that act, but under the contract made in
pursuance of it.

If the contract had been made upon the general credit of the State,
she could pay when and as she pleased. So if the times of payment
only had been fixed, and the amounts, but no mode of payment ascer-
tained and no fund provided, it would be in the power of the Legisla
ture to declare by whom, and in what manner, and out of what fund the
money should be paid; and until legislation on the subject, the lessee
would have no perfect right to payment. In such a case, the Legisla-
ture might appropriate or not, as it pleased, and might revoke an appro-
priation already made, because such was the contract. There would
have entered into it, as one of its elements, as an implied condition, that
in respect to the claim of the lessee, the Legislature should provide, at
a future time, a mode and means of payment. The obligation of the
State would have been, and it would be considered as so expressed by
the language of the contract, to pay the stipulated sum through the
agency of such officer as might afterwards be named, and out of such
appropriation as should be afterwards made by the Legislature.

Instead of a stipulation for payment generally, in a mode and out of
a fund to be provided by the Legislature, when, and as it pleased, this
contract itself specifies the mode and designates the fund. It gives
security to the lessee. It leaves nothing to future legislation, but assures
to the lessee a perfect and absolute right of payment, by enactments
which are irrevocable under the Constitution.

If the Legislature can do this, what guaranty is there for the rights of those creditors who hold the bonds of the State, issued under the several funding acts? Those acts provide a fund for the payment of accruing interest, and the ultimate payment of the principal of the bonds, by appropriating certain revenue and directing its application to those purposes, and the Legislature cannot revoke those appropriations and prohibit the Treasurer from paying the interest of the bonds, because, by the contract, the fund is beyond the reach of the Legislature; because to attempt any other application of it than that promised by the law, or to create an impediment in the way of its application as promised, would be to impair the obligation of the contract with the public creditors.

Yet the bond holders occupy the same position as the appellants, and have no higher or more perfect right. Both have contracted with the State upon the faith of a pledge of the State to make payments on given days, in a specified manner, and out of a fund provided for the purpose.

The contract between the State and the lessee only gives to the latter the right to have his warrants paid out of any money in the treasury not otherwise appropriated, to be paid in a certain way; and that right could not be affected by any subsequent legislation. But there is nothing in the contract in the shape of a guaranty by the State, that there shall, of such money, be enough in the treasury to pay him. The contract leaves to the Legislature all the power it ever possessed over the subject of taxation. It could, without any violation of the contract, cease to impose taxes, and leave nothing in the treasury wherewith to pay the lessee. And there is nothing in the contract to restrict the power of appropriation.

But if, out of the revenue raised under laws passed by the Legislature in the exercise of its functions, there remains in the treasury, as there is shown to be, a sum of money not otherwise appropriated, the appellants claim it, and deny the power of the Legislature to recall the promise made by the State that they should have it.

The power claimed for the Legislature in the management of the financial affairs of the government is admitted, with this limitation: that it is not estopped, by the contract of the State, from exercising the power in a particular instance.

As an instance of such an estoppel, take the case, already put, of the creditors under the funding acts. The Legislature which authorized the

funding of the public debt, withdrew from its own control, and that of all succeeding Legislatures, the fund pledged to the public creditors. In so doing, it did not derogate from its own power, or that of subsequent Legislatures, but merely placed a particular subject matter beyond the reach of that power. It acted in regard to it finally, and it could be the subject of no future action.

*Thos. H. Williams, Attorney General,* for Respondent.

I.   The Controller had no authority to draw the warrants claimed, unless the money to pay them was in the treasury, and consequently he cannot be compelled to do so. (Wood's Dig. 94, secs. 5 and 6.)

II.   There was no specific appropriation of funds in the treasury for the payment of the warrants sought, and consequently the Controller had no authority to draw them. (Wood's Dig. 94, secs. 5 and 6 ; *Redding* v. *Bell,* 4 Cal. 333 ; *Butler* v. *Bates,* 7 Id. 137.)

III.   The claim should have been first presented to the Board of Examiners and approved by them, before the Controller could have been required to draw his warrants for the same. (Statutes 1856, 100 ; Statutes 1858, 212.)

Estill made his contract subject to all laws then existing, or such as might thereafter be passed. At that time the law made provision for the appointment of other auditing officers than the Controller. (Wood's Dig. 94, secs. 5 and 6.) And the Acts of 1856 and 1858, both in terms embrace this character of claims, as well as all others, which acts, if retrospective, merely affect the remedy and are therefore constitutional. (*Sturgiss* v. *Crowningshields,* 4 Wheat. 200 ; *Mason* v. *Haile,* 12 Id. 378 ; *Butler* v. *Palmer,* 1 Hill, 324.)

The constitutionality of the Board of Examiners was affirmed in *Ross* v. *Whitman* (6 Cal. 361).

IV.   Relator claims that he is entitled to draw ten thousand dollars per month from the State treasury, during the period of time that the State was in possession of the prison and bore the expenses of maintaining it. This is inequitable and unconscionable, and as this is in the nature of an equitable proceeding, such claim should not be maintained. No greater sum should be allowed in this proceeding than could be recovered in an action at law, provided the State had authorized suit to be instituted. In such suit McCauley could only have recovered for the time mentioned, the amount of actual loss sustained by him. (*Baldwin* v. *Bennett,* 4 Cal. 392, and authorities there cited by Appellant's counsel ; *Cunningham* v. *Dorsey,* 6 Id. 19.)

McCauley *v.* Brooks.

V. Mandamus is not the proper remedy. The writ of mandamus can only be issued to an inferior tribunal, corporation, board or person, to compel the performance of an act which the law specially enjoins upon such person, tribunal, etc. (Wood's Dig. 225, sec. 467.)

The Controller of State does not come within the category named. On the contrary, he belongs to a coördinate department of the government, of equal power and dignity to the judicial department, and in the discharge of the duties of his office, he is as independent of the judiciary as the latter is of the executive branch.

It is admitted to be difficult to cite judicial authority upon this branch of the case; and very naturally so, for the point involved is one of power, and in reference to which a constant struggle for the supremacy has been going on for years. The judiciary have assumed power in all cases where not resisted by the other departments of the government, and it is not to be expected that many cases can be found in which the judges themselves have acknowledged or admitted propositions against their exercise of power. (But see 1 Texas, 764; 2 Id. 497; 4 Pike, 220.)

VI. According to judicial authority, mandamus will not issue to compel the performance of an act which pertains to the discharge of the ordinary duties of an executive officer—such duties as necessarily result from the organization of the office,—but only when the act is merely ministerial, created by act of the Legislature and is devolved upon the individual and not the officer. It is never used to compel the payment of money from the government treasury, nor in cases involving any investigation, examination or exercise of judgment or discretion. (*Brashear* v. *Mason*, 6 How. U. S., from latter part of page 100 to 103; *Reesick* v. *Walker*, 11 How. 289–290; *Decatur* v. *Paulding*, 14 Pet. 515, 16–18; *United States* v. *Seaman*, 17 How. 230, 231; *United States* v. *Guthrie*, Id. 302, 303, 304; 3 Florida, 202.)

VII. The State cannot be sued either directly or indirectly without its consent, and she is the only party in interest in this proceeding. (*Reesick* v. *Walker*, cited above.)

VIII. Admitting that the Act of 1856 was originally obligatory upon the Controller, still that of 1859 (Statutes 1859, 374) repealed it, which amounted to repudiation, and it cannot be denied that the State has a right to repudiate any demand she may see proper.

IX. The Court is asked to review its opinion, in the case of the *State* v. *McCauley*, holding the contract between Estill and the Commis-

sioners binding upon the State, upon the grounds stated in the brief of appellant therein filed.   (See 15 Cal. 436.)

FIELD, C. J. delivered the opinion of the Court—COPE, J. concurring.

This is an application for a mandamus to compel the respondent, as Controller of the State, to issue his warrants to the relators, upon the Treasurer, for the sum of $270,000, alleged to be due to them on the twenty-sixth of March, 1860, upon a contract made in the name and on behalf of the State by the Board of State Prison Commissioners with James M. Estill, under the Act of March 21st, 1856.   That act required the Commissioners to lease the State prison grounds and property, with the labor of the convicts, for a period of five years, at a price not exceeding $15,000 a month, and to provide in the contract with the lessee for the erection, at his expense, of such buildings as would conduce to the convenient and safe keeping and working of the convicts, and to exact from him a bond in the penal sum of $200,000, with sufficient sureties, conditioned for the faithful performance of the contract.

The seventh section of the act is in these words: " The sum of fifteen thousand dollars per month, or such sum per month less than that amount, in accordance with the contract to be made by said Board of Commissioners, as specified in sections first and second of this act, is hereby appropriated out of any money in the treasury not otherwise appropriated; and the Controller of State is hereby authorized and required to draw his warrants on the Treasurer of State for said sum; and the Treasurer of State is hereby directed to pay the said warrants, on application of said lessee in writing, on the last day of each month."

The contract was entered into on the twenty-sixth of March, 1856, and is for the designated period of five years.   By it the State stipulates and agrees, upon the considerations therein specified, to pay the lessee at the end of each month during the continuance of the term, the sum of $10,000, in conformity with the law regulating the Board of Commissioners, and defining their powers and duties.

Upon the execution of the contract, Estill took possession of the prison grounds and property, and of the convicts confined in the prison, and continued in such possession until the fourteenth of May, 1857, when he assigned and transferred to McCauley all his interest, rights and privileges under the contract until the twenty-sixth of February, 1861, with the exception of a right to draw one-half of the monthly

sum stipulated to be paid by the State, the lessee reserving that right to himself. On the following day, McCauley received possession of the premises, and proceeded to discharge the obligations of Estill under the contract. Subsequently the remaining interest of the lessee was assigned—one-half thereof to McCauley, and the other half to Tevis, who are the relators in the present proceeding.*

From the date of the contract with Estill until the assignment to McCauley, the State, under the provisions of the Act of March 21st, 1856, paid to the lessee the monthly instalments stipulated, and after the assignment, until the twenty-sixth of December, 1857, paid the same to the lessee and McCauley jointly. These payments were irregularly made, and a part of the time in depreciated paper; but no question arises in the present proceeding from that circumstance. Since the twenty-sixth of December, 1857, no payments of any kind have been made, but on the contrary, the payment shave been expressly refused. From that time to the present, with the exception of the period during which he was illegally and forcibly dispossessed by the Governor under the Act of the twenty-sixth of February, 1858, McCauley has been in the possession of the premises, and has fulfilled the conditions of the contract with the State. On the twenty-sixth of March, 1860, there was due to the relators, according to the terms of the contract, the sum of $270,000; and on the twentieth of April they demanded of the Controller warrants for this sum upon the Treasurer of the State. At that time there was in the treasury, and in the general fund, of money not otherwise appropriated, and subject to be applied to the payment of the warrants, the sum of $230,000. The Controller refused to draw his warrants, and hence this application to the Court for the mandamus.

In the case brought by the State against McCauley and Tevis for the cancellation of the contract with Estill, we had occasion to consider the validity of the contract, and of its assignment, and the legislation had in relation to the same. We there held the Act of March 21st, 1856, constitutional, and the contract valid and binding upon the State. The same objections urged in that case have been repeated in this; and we

---

*NOTE.—In the opinion in the case of the *State* v. *McCauley* (15 Cal. 451) it is stated that all the remaining interest of the lessee was assigned to Tevis. It so appeared from the pleadings in that case, from which the statement was made. It was a mistake of the pleader, though an immaterial one so far as any question involved was concerned.

3

have been earnestly requested to reconsider two, at least, of the positions laid down in our opinion—those which relate to the alleged want of authority in the Commissioners to make the contract in question, and to the alleged forfeiture of the lease by the assignment. We have listened with patience to the argument of the Attorney General on them, and after careful examination, we find nothing new advanced which creates a doubt of the entire correctness of the views we had expressed. Indeed, none of the cases relating to the State prison and the contract with the lessee, which have been before this Court, appear to us to have required for their determination anything beyond the application of well settled and familiar principles. There has been nothing novel in the questions they presented, and the only interest they have elicited has arisen from the nature of the property involved, and the character of the parties to the controversies.

The Commissioners were authorized under the act to contract with the lessee, at a price not exceeding $15,000 a month, and they made the contract for $10,000 a month. It is the additional stipulations, which it embodies, for the release of certain claims against the State, and the assignable form of the lease, which constitute the grounds of objection. These grounds do not go to the authority of the Commissioners or affect the validity of the contract. They only go to the policy of the contract, and whatever consideration they might have been entitled to receive, had they been taken at the outset, it is clear it is now too late to urge them. The Legislature at the time interposed no objections of the kind. It may well have thought that, as the additional stipulations imposed no additional burdens, the release of the claims secured by the contract was an advantage which it preferred to retain; and may have been satisfied with the security of the bond against any public inconvenience from a possible transfer of the lease. At any rate, the contract was acquiesced in and affirmed; the lessee took possession, maintained the convicts and erected valuable improvements upon the premises, and the State, until the twenty-sixth of December, 1857, paid the monthly instalments stipulated. After such acquiescence and part performance, objections to the form or provisions of the contract cannot be raised.

We do not admit that an affirmation of a contract entered into by the agents of the State, upon a subject within the constitutional control of the Legislature, can only be made by direct legislative action, in terms designating such contract. On the contrary, such affirmation may be

McCauley *v.* Brooks.

justly inferred from legislation indirectly referring to the contract, or proceeding upon its assumed validity. Thus, in the Act of April 7th, 1856, appropriating moneys to defray the expenses of the prison up to March 28th, passed after a copy of the contract with Estill had been transmitted to the Senate, the Legislature recognized the existence, and in effect the validity of the contract, in the provision that no person should receive any pay for supplies furnished under any contract with the directors of the prison, until he surrendered such contract and released the State from all liability for such supplies "furnished *after the leasing* of said prison by the Board of Commissioners under an act passed at this session of the Legislature." That provision was manifestly adopted upon the supposition that the responsibility for supplies furnished subsequently to the time the prison was received by the lessee, had devolved upon him, and that the contract for the leasing, imposing such responsibility, was valid and binding. (See Journals of the Senate of 1856, page 658; Laws of 1856, chap. 72.)

As the contract was binding upon the State, it became the duty of the Controller, under the law which entered into and formed a part of the contract, to issue warrants for the monthly instalments specified, when demanded, unless there was something in the existing or subsequent legislation of the State, which qualified the right of the lessee or those representing him. Such existing legislation is asserted to have been had by the Act of April 13th, 1854, amendatory of the act concerning the office of Controller, which provides that no warrant shall be drawn on the treasury except there be an unexhausted specific appropriation by law to meet the same. (Laws of 1854, chap. 21.) Such subsequent legislation is asserted to have been had by the Act of April 16th, 1856, for the better protection of the State treasury, which provides that in all cases, except for the salaries of officers, the claims or demands for which warrants are drawn must have the previous approval of the Board of Examiners; and by the Act of April 21st, 1858, creating a Board of Examiners and defining their powers and duties, which in substance reënacts the same provision; and by the Act of April 19th, 1859, to condemn and appropriate to the use of the State the interest of certain parties in the State prison grounds, which repeals the Act of March 21st, 1856, making the appropriation. (Laws of 1856, chap. 85; Laws of 1858, chap. 257; Laws of 1859, chap. 330.)

The grounds, then, upon which the respondent denies the right of the

relators to the warrants they demand, are these: 1. That there was no unexhausted specific appropriation by law to meet the same; 2. That the claims of the relators had not received the previous approval of the Board of Examiners; and 3. That the law under which the contract was made, and which specifically directs him to issue the warrants, has been repealed.

1. The seventh section of the Act of March 21st, 1856, appropriates the sum of $15,000, or such sum per month less than that amount as may be provided by the contract to be entered into by the Commissioners for the services to be rendered by the lessee. It makes the appropriation, not at once for the whole amount stipulated for the five years, but for the services as they are rendered, acting in fact only from month to month. To an appropriation within the meaning of the Constitution, nothing more is requisite than a designation of the amount, and the fund out of which it shall be paid. It is not essential to its validity that funds to meet the same should be at the time in the treasury. As a matter of fact, there have seldom been in the treasury the necessary funds to meet the several amounts appropriated under the general appropriation acts of each year. The appropriation is made in anticipation of the receipt of the yearly revenues. It constitutes, indeed, the authority of the Controller to draw his warrants, and of the Treasurer, when in funds, to pay the same, and that is all. When the Constitution, therefore, says that "no money shall be drawn from the treasury but in consequence of appropriations made by law," it only means that no money shall be drawn except in pursuance of law. And when the Act of April 13th, 1854, provides that no warrants shall be drawn, except there be "an unexhausted specific appropriation" to meet the same, it means only that the Controller shall not draw a warrant for a specific object when he has already drawn for the full amount of the appropriation made for that object. There is, therefore, nothing in that act which in any respect qualifies the right of the lessee, or those representing him, to the warrants for the monthly instalments as they respectively became due under the contract.

2. The Act of April 16th, 1856, requiring that demands against the State, except for the salaries of officers, must receive the approval of the Board of Examiners before warrants can be issued for them by the Controller, in its terms covers the claim of the relators. The ninth section, in our judgment, is not a restriction of the provisions of the act to cases subsequently arising, but an extension of its provisions to such

McCauley *v.* Brooks.

cases, rendering future directions upon the Controller subject to them.\* The Act of April 21st, 1858, in like manner embraces in its general terms the claim of the relators.† Neither of the acts, however, can subject that claim to its provisions, notwithstanding the claim is within the comprehensive language of both. The contract contains no condition that the claim shall be subject to the approval of any Board, nor does the Act of March 21st, 1856, to which the contract refers, and upon which it rests. In respect to. the payments to be made by the State, the contract purports to express the exact terms of the act. It contains the covenant of the State to pay the lessee at the end of each . month, during the continuance of the term, the sum of $10,000—the same " to be paid in conformity with the law creating the said Board of Commissioners, and defining their powers and duties." That law makes the appropriations for the monthly instalments as they respectively become due, requires the Controller to draw his warrants for the same, and directs the Treasurer to pay them on application at the end of each month. The absolute right to the warrants thus secured cannot be changed by any subsequent legislative enactment into a right, dependent for its enjoyment upon the will and discretion of any Board established by the State. The Legislature might as well make the issuance of the warrants depend upon the approval of any or every officer of the State—of the Sheriff of Klamath, or the Judge of Nevada, or the Mayor of Los Angeles, or even upon a popular election. The imposition of any conditions not provided by the terms of the original contract,

---

\* The ninth section is as follows:—" And whenever, hereafter, the Controller shall by law be directed to draw his warrant upon the Treasurer of the State for any purpose whatsoever, said direction shall be construed to be subject to the provisions of this act, unless said direction be accompanied by a special provision, exempting it from the operation of this act. All acts and parts of acts contrary to this act, are hereby repealed."

† The fifth section of this act is as follows :—" The Controller shall be authorized to draw his warrants on the Treasurer for the salaries of officers, when appropriations are or shall have been made therefor by law ; but in all other cases, previous to drawing his warrants, in liquidation of any claim or demand whatever, the said claim or demand must have endorsed thereon the previous approval of the Board of Examiners and whenever, hereafter, the Controller shall, by law, be directed to draw his warrant upon the Treasurer of State, for any purpose whatever, said direction shall be construed to be subject to the provisions of this act, unless said direction be accompanied by a special provision exempting it from the operations of this act."

is not within the constitutional power of the Legislature. Any law attempting to make such imposition is invalid, as impairing the obligation of the contract. "The objection to a law," observes Mr. Justice Washington, of the Supreme Court of the United States, in *Green* v. *Biddle* (8 Wheat. 84) "on the ground of its impairing the obligation of a contract, can never depend upon the extent of the change which the law effects in it. Any deviation from its terms by postponing or accelerating the period of performance which it prescribes, imposing conditions not expressed in the contract, or dispensing with the performance of those which are however minute or apparently immaterial in their effect upon the contract of the parties, impairs its obligations."

That the acts requiring the previous approval of the claim of the lessee by the Board of Examiners, render the contract less beneficial to him, is manifest. They place his rights in the power of a body whose action he cannot control, and whose discretion is unlimited. Apply the case to the contract of individuals: A agrees, for services to be rendered, to give his note to B. When the services are rendered, B applies for the note, and is met by a refusal unless he previously obtains the approval of some third party designated by A himself. Would such a refusal be listened to for a moment? Would a law changing the absolute engagement into one conditioned upon the assent of such third party, be upheld in any Court of the United States? Clearly not. And the same constitutional inhibition which protects contracts between individuals from being impaired by the Legislature, extends to contracts between individuals and the State. The principles laid down in *Fletcher* v. *Peck* (6 Cranch, 87) says Mr. Justice Washington in the opinion in *Green* v. *Biddle,* from which we have already cited, " are that the Constitution of the United States embraces all contracts, executed or executory, whether between individuals or between a State and individuals, and that a State has no more power to impair an obligation into which she herself has entered than she can the contracts of individuals."

" It is immaterial," observes Mr. Smith, in his commentaries on statute and constitutional law, " whether the contract be one between a State and an individual, or between individuals only ; the contracting parties, whoever they may be, stand in this respect upon the same ground. The obligations imposed and the rights acquired by virtue of the contract, cannot be impaired by a Legislative act." (Coms. sec. 252; *Providence Bank* v. *Billings et al.* 4 Pet. 514; *Dartmouth College* v. *Woodward,* 4 Wheat. 518; *Green* v. *Biddle,* 8 Id. 1.)

McCauley *v*. Brooks.

But it is said that the requirement of the statutes as to the previous approval of the Board of Examiners, merely affects the remedy. This is not so. On the contrary, the requirement operates directly upon the ·contract itself, interpolating a new term and changing the absolute right of the lessee to the warrants into a conditional and dependent one. But admitting that the requirement relates only to the remedy—that remedy is so changed by it as to materially impair the right; and legislation producing this result, is as much within the inhibition of the Constitution as if it directly assailed the right. In *Green* v. *Biddle*, already referred to, the Supreme Court of the United States, in speaking of the occupying claimant laws of Kentucky, said: "If those acts so change the nature and extent of existing remedies, as materially to impair the rights and interest of the owner, they are just as much a violation of the compact as if they directly overturned his rights and interests."

In *Bronson* v. *Kinzie* (1 How. 311) the same Court cites with approbation the opinion in *Green* v. *Biddle*, and adds : "It is difficult, perhaps, to draw a line that would be applicable in all cases between legitimate alterations of the remedy, and provisions which, in the form of remedy, impair the right. But it is manifest that the obligation of the contract, and the rights of a party under it, may, in effect, be destroyed by denying a remedy altogether; or may be seriously impaired by burdening the proceedings with new conditions and restrictions, so as to make the remedy hardly worth pursuing. And no one, we presume, would say that there is any substantial difference between a retrospective law declaring a particular contract, or class of contracts, to be abrogated and void, and one which took away all remedy to enforce them, or encumbered it with conditions that rendered it useless or impracticable to pursue it."

In *McCracken* v. *Hayward* (2 How. 608) the same Court held the law of Illinois, providing that a sale should not be made of property levied on under execution, unless it would bring two-thirds of its valuation, according to the opinion of three householders, to be within the constitutional prohibition and void. "The obligation of a contract," said the Court, "consists in its binding force on the party who makes it. This depends on the laws in existence when it is made; these are necessarily referred to in all contracts, and forming a part of them as the measure of the obligation to perform them by the one party and the right acquired by the other. There can be no other standard by which to ascertain the extent of either than that which the terms of the contract indicate,

according to their settled legal meaning; when it becomes consummated, the law defines the duty and the right, compels one party to perform the thing contracted for, and gives the other a right to enforce the performance by the remedies then in force. If any subsequent law affect to diminish the duty or to impair the right, it necessarily bears on the obligation of the contract in favor of one party to the injury of the other; hence, any law which in its operation amounts to a denial or obstruction of the rights accruing by a contract, though professing to act only on the remedy, is directly obnoxious to the prohibition of the Constitution."

If we apply now the principle thus enunciated by the highest tribunal of the Union—and it is to be observed that the inhibition of the Federal Constitution is incorporated, with reference to the Legislature of this State, into our own—all doubt as to the invalidity of the Acts of April 16th, 1856, and of April 21st, 1858, so far as the claim of the relators is concerned, must disappear. The contract, and the law under which it was made, impose a mere ministerial duty upon the Controller, which, as we shall hereafter show, was capable of enforcement. The acts in relation to the Board of Examiners, requiring its previous approval, changed that duty and made it dependent and conditional. That Board has a discretion to allow or refuse a claim before it. It may be compelled to act upon any specific claim, but its discretion as to allowance or rejection is unlimited. The effect then of the acts in question is to take from the lessee, or those representing him, all power to enforce his or their rights upon the Controller until an intermediate body has expressed its approbation. As to that claim, arising under contract with the State, those acts can have no operation. As to that claim, those acts are unconstitutional and void.

A decision upon a somewhat analogous question was made by this Court in *Robinson et al.* v. *Magee* (9 Cal. 81). In that case the question was as to the validity of the act of the Legislature requiring the holders of certain orders or warrants drawn upon the Treasurer of Calaveras county to present them to the Auditor of that county for registry before the first of July, 1855, or be barred from enforcing their payment. "As the law enters into the contract, and forms part of it," said Mr. Justice Burnett, "the obligation of such contract must depend upon the law existing at the time the contract was made. The contract being, then, complete and operative, the Legislature cannot by a subsequent act impair its obligation by requiring the performance of *other* conditions not required by the law of the contract itself. The rights as well as

McCauley *v.* Brooks.

the intentions of the parties are fixed and ascertained by the existing law. Therefore to require the performance of *other* conditions, to make the contract operative, is to impair its obligation. The power to impose conditions after the contract is once complete and perfect, is nothing but the power to impair its obligation, and this the Constitution has prohibited."

3. The Act of April 19th, 1859, providing for the condemnation and appropriation to the use of the State of the interest of certain parties in the State prison grounds, repealed the Act of March 21st, 1856; but such repeal did not affect the contract made under the repealed act. The contract was a thing consummated—and after its execution did not depend for its further existence upon the continuation of the act which originally gave it life. The contract remained, after the extinction by repeal of its parent act, possessed of the same operative and binding force as previously. The rights of the parties and their respective obligations became fixed by that instrument beyond the reach of legislative power. They required for their enforcement no further legislation or reference to the act under which they were created, and were vested interests. The premises constituting the prison and prison grounds had been leased for five years, and the leasehold interest was beyond the power of revocation. It was vested for that period, and the right to the $10,000 a month was equally so. Upon neither the right to the interest in the property or to the money could subsequent legislation operate. The Constitution tolerates no such absurdity as the total destruction of a contract, whilst it inhibits attempts to impair its efficacy.

If the proposition that a repeal of the Act of March 21st, 1856, discharged the appropriation and rendered the contract no longer obligatory could be sustained—it is not perceived why repudiation of bonds issued under the various funding acts of the State may not, on the same grounds, be defended. The indebtedness of several cities and counties of the State has been funded, and bonds have been issued therefor under different statutes, which provided at the same time the means for meeting the yearly interest thereon, and for their ultimate payment. It would be a strange doctrine that a repeal of any such funding acts would impair the right of the bond holders, either to their interest or principal. The learned Attorney General would never advance a doctrine so repugnant to all just notions of the obligations of good faith, and the guaranties furnished by the Constitution. And if the State were indebted within the constitutional limit—excluding the amount rendered valid by the

vote of the people—and should see fit in like manner to fund the indebtedness, he would not contend, we are confident, that subsequent legislation could impair, much less destroy, the rights of the parties taking her bonds.    And yet her faith would be no more pledged for their payment, than it is to discharge the obligations of the contract in relation to the State prison.    The contract with the bond holders and the contract with the lessee would stand upon the same footing.    The repudiation of one would not be more odious than would be the repudiation of the other. If she can do one, she can the other.    If she can repudiate one, she can repudiate both.    The truth is, she can do neither.    The appropriation once made—the funds to meet it having been provided and received into the treasury—the Legislature cannot, by revoking the appropriation, prohibit the Treasurer from making the payments designated.

We admit that the Legislature possesses the entire control and management of the financial affairs of the State; that it can levy such taxes as it may deem expedient, subject only to the constitutional requirements of equality and uniformity, and devote the proceeds of the taxation to such specific objects as it may think proper.    But we deny that after having made an appropriation in view of a contemplated contract to be based thereon, and such contract is made, and funds to meet the appropriation are received into the treasury, it can deprive the party with whom the contract is entered into of such funds by repealing the appropriation.    In other words, the control of the Legislature over particular funds, when received, may be subject to the obligations of a contract made with reference to them.    By such contract, the Legislature does not derogate from its own power or that of any subsequent Legislature.    It only acts finally upon a particular subject, which is thus placed beyond the reach of future action.    It is true, the Legislature may not direct any taxation, may repeal all laws relating to the collection of the revenue, and thus prevent the receipt of any funds upon which the appropriation can operate; but this possibility does not affect the right of the parties when such funds are actually received.    As is well observed by Mr. Justice Baldwin, in the case of *People* v. *Bond*, to which we shall hereafter refer, " a man pledging the fruits of his labor to pay his debts, may not be compelled by his creditor to work, but if he does work and earns the money, we suppose it could scarcely be held that he may dispose of the money as he chooses."    Nor is there anything in the cases of *McDonald* v. *Griswold* (4 Cal. 352) and *McDonald* v. *Maddux*, (11 Cal. 187) cited by respondent, which in any respect

McCauley *v.* Brooks.

trenches upon these views. The first case only decides that the fund raised by taxation in Sacramento county, from the levy for county purposes, directed by the Court of Sessions under the Revenue Act of 1853, was to be considered as appropriated to the payment of the current expenses of the year, and was not to be applied to the payment of the previous indebtedness of the county. The second case was an application for a mandamus to compel the Treasurer of Sacramento county to pay certain warrants issued in 1853. The warrants were presented to the Treasurer during that year, and the payment refused for want of funds, and they were then registered. During the year, a large sum of money was received, properly applicable to the payment of these warrants, and sufficient to pay them in the order of their registry. The Treasurer, however, refused to pay them, and on the settlement of his official business, after going out of office, delivered to his successor, in lieu of the money, certain funded bonds of the county. By the Act of 1854, to fund the floating debt of the county, it was made unlawful to redeem any warrants of the county drawn for indebtedness arising prior to the first of May, 1854, except with funds then on hand, or which might be received after that date, properly belonging to the previous revenue of the county. The Legislature, in this particular, only directed the application of future revenues of the county to certain purposes, and in that respect, only exercised an acknowledged constitutional power. By the mandamus, the applicant sought to subject to the payment of his warrants of 1853, funds collected in 1856, which belonged to the revenue of the county of the latter year, and this the Court held he could not do under the prohibition contained in the funding act; and observed that there could be "no serious question of the power of the Legislature to direct in what manner the debts of the county shall be paid, or its funds disbursed subject to certain well known restrictions," which did not apply to that case. We admit the correctness of the proposition thus laid down. Subject to certain well known restrictions, the power of the Legislature to direct the manner in which the funds of a county or of the State shall be disbursed, is unquestionable. These restrictions, as we have already shown, exist when particular funds are already the subject of appropriation under a contract.

In the case of the *People* v. *Bond* (10 Cal. 566) the effect upon the power of the Legislature of these "well known restrictions" is to some extent considered. By the Act of May 1st, 1851, providing for the funding of the floating debt of the city of San Francisco, the Com-

missioners created thereunder are required every year to certify to
the City Assessors the amount necessary to be raised for the payment
of the annual interest on the debt funded. It thereupon becomes the
duty of the Assessors to add such amount to the assessment roll, and
the sum of $50,000 for the purpose of a Sinking Fund; and the duty
of the Collector to pay into the City treasury, and of the Treasurer
into the hands of the Commissioners these amounts, out of the first
moneys collected upon the whole general assessment list. The Consol-
idation Act of 1856 gave to the Board of Supervisors the power to
raise such amount by taxation, as they might deem sufficient to meet all
the demands on the treasury, provided they did not exceed a certain
rate of taxation, and declared that the demands of the Fund Commis-
sioners should be paid out of the General Fund thus raised. It was
contended that there was a conflict between these acts as to the man-
ner in which the tax was to be assessed, and as to the parties through
whom the creditors were to be paid their interest, and that the Consoli-
dation Act operated as a repeal to that extent of the Funding Act.
The only question submitted was, whether the provisions of the Fund-
ing Act to which we have referred continued in force; and the Court
held that so far as the Consolidation Act merely altered the mode of
levying the tax, as the result was the same, it did not in substance con-
flict with the previous act, but that it was not competent for the Legis-
lature to substantially change the character of the act. "We consider,"
said the Court, "the act (a private act, it is true, but none the less bind-
ing on that account) as substantially a trust deed, whereby she (the city)
agrees, on a valuable consideration, to place in the hands of certain
trustees so much of her revenue and property, to be applied by the
trustees to the redemption of her obligations, in the mode and according
to the terms of her agreement. It is too clear for argument that, if a
private individual owes debts, and has rents or income, and pledges
these to pay his debts to his creditors, the property and income must be
so appropriated. Why not a corporation? The law makes no distinc-
tion as between these classes of debtors in this respect, and we see no
reason why the the Courts should.

"The Act of 1851 being of this character, it was not competent for
the Legislature to substantially change its terms without the sanction of
the creditors. And it therefore becomes unnecessary that we should scan
the provisions of the Act of 1856, to see whether there is any irrecon-
cilable conflict between the latter and the former acts. We are saved

the necessity of wandering through the mazes of the complex, though on the whole beneficial contrivance, called the Consolidation Bill; for it is immaterial whether, in its material features it does or does not conflict with the Act of 1851, for in either case, the act must in substance prevail."    *    *    " It will be seen that the City Assessor and the City Treasurer, by the Act of 1851 are put in direct relations with the Commissioners, and that clear and definite duties are assigned to them respectively, of a simple ministerial character.· No one else is authorized to intervene between them, or to disturb these relations.  Neither the old city government nor the present city and county government, neither the Mayor and Council nor the Board of Supervisors, have any such authority; and especially—though these bodies might see to the safety of this fund as well as any other portion of the city municipal finances while in the treasury—have they no right or authority to prevent its instant payment by the Treasurer, in pursuance of law, to the Commissioners.  It is just as incompetent for the Legislature to subject this money, lying in the treasury in trust for the Commissioners, and immediately payable to them, to the supervision, discretion, or control of the Board of Supervisors, as it would be incompetent to add any other term to the contract, or to declare that A should not pay B a debt past due until payment of it had received the sanction of C.  The debt is due and liquidated; every term of the contract is settled; nothing remains to be done but the fact of immediate payment by the Treasurer.  It requires no auditing.  The propriety of the payment is not to be passed upon; the simple ministerial duty of counting and handing over the money by the Treasurer, who alone is trusted with that duty, remains, and *he* must discharge that legal duty thus cast upon him, and not wait until it pleases the Supervisors to meet, and meeting, to take up the question, and taking it up, allow it to be paid or not, at their discretion. If this were admissible, the contract would read, not that this money shall be the first paid, immediately, or as fast as collected by the Treasurer, to the Commissioners, but the agreement would be that the money shall be paid whenever it suits the Supervisors to order the Treasurer to pay it, and not paid at all if they do not so order.  This was not the contract, in its letter or in its substance."

It follows from the views we have expressed that there is nothing in the legislation of the State, existing at the time of the contract with Estill, or in any subsequent legislation, which qualifies the right of the relators to the warrants for the sums stipulated, or justifies the Con,

troller in his refusal to issue them. Nor is there anything in the position that the relators are not entitled to the full sum of $10,000 a month for the period during which the lessee and his assignee were forcibly and unlawfully kept from the possession of the prison under the Act of February 26th, 1858.

The contract is not from month to month, but for the entire term of five years, the payments by the State to be made in monthly installments. The consideration advanced by the lessee for these payments is not merely the services rendered each month. It consists of buildings erected and other improvements made. These were not intended for any particular month, but for the entire term. The expenses of them cannot be apportioned out and considered as belonging to one or more months rather than others. These expenses probably absorbed the receipts of many months, and for reimbursement the lessee undoubtedly looked to the general profits from the entire contract. Again, large claims against the State were relinquished by the lessee as part of the consideration of the payments by the State—not of one or of several months, but of the entire term. To the general profits of the whole term the lessee looked, as furnishing the equivalent for the relinquishment. Again, the lessee, or the other parties representing him, were entitled to the labor of the convicts; and the profits of that labor, in the manufacture of brick or other articles of commerce, during the period the parties were excluded from the prison, may have exceeded the entire expenses of keeping the prison. Again, what is to be said of the use of the property of the parties during this period of exclusion, of the derangement of their business, of interference with their existing contracts for supplies, or contracts to furnish the product of the labor of the convicts? It is unnecessary, however, to pursue this matter further. The contract, from its terms, is incapable of apportionment, and the measure of damages in such cases is the sum fixed by the contract itself. "When the parties," says Parsons, "enter into a contract by which the amount to be performed by one, and the consideration to be paid by the other are made certain and fixed, such a contract cannot be apportioned." (On Contracts, 2 vol. 33.) The unlawful exclusion of the lessee and his assignee, though made under the assumed sanction of the Legislature, and productive of large expenditures to the State, cannot deprive the parties of their right to the sums stipulated.

The contract between the State and Estill remaining therefore obligatory, not qualified by any legislation, it was the duty of the Controller

McCauley *v.* Brooks.

to have issued the warrants upon the demand of the relators. But it is asserted by the Attorney General that, admitting the legal duty, the performance of that duty cannot be enforced by mandamus, and this position is made to rest upon what is termed the independence of the different departments of government.

The fourth article of the Constitution reads as follows: " The powers of the government of the State of California shall be divided into three separate departments — the legislative, the executive and judicial — and no person charged with the exercise of powers properly belonging to one of these departments shall exercise any functions appertaining to either of the others, except in the cases hereinafter expressly directed or permitted." There is nothing in this distribution of powers which places either department above the law, or makes either independent of the other. It simply provides that there shall be *separate* departments, and it is only in a restricted sense that they are independent of each other. There is no such thing as absolute independence. Where discretion is vested in terms, or necessarily implied from the nature of the duties to be performed, they are independent of each other, but in no other case. Where discretion exists, the power of each is absolute, but there is no discretion where rights have vested under the Constitution, or by existing laws. The Legislature can pass such laws as it may judge expedient, subject only to the prohibitions of the Constitution. If it overstep those limits and attempt to impair the obligation of contracts, or to pass *ex post facto* laws, or grant special acts of incorporation for other than municipal purposes, the judiciary will set aside its legislation and protect the rights it has assailed. Within certain limits it is independent; when it passes over those limits, its power for good or ill is gone.

The duty of the judiciary is to pronounce upon the validity of the laws passed by the Legislature, to construe their language and enforce the rights acquired thereunder. Its judgment in those matters can only be controlled by its intelligence and conscience. From the nature of its duties, its action must be free from coercion. But it is not independent of the Legislature in numerous matters materially affecting its action and usefulness. The Legislature fixes the places of its sessions, determines the number of its terms, and in the regulation of proceedings in civil and criminal cases, provides the manner in which suits shall be brought, prosecutions conducted, appeals taken, and all the vast machinery by which rights are asserted and wrongs redressed. In all these

matters, with certain limited exceptions, the judiciary is a dependent department. To the executive department a large and important class of duties is entrusted, in the performance of which its officers are subject to no control. The Governor, the head of that department, can recommend such measures as in his judgment will promote the public interest; he can approve or disapprove of such legislation as in his opinion may advance or injure the public welfare; he can exercise his discretion in numerous appointments to office; he can grant such reprieves and pardons for all offenses after conviction, except for treason and in cases of impeachment, as he may think proper, and call out the militia when he considers that proceeding necessary to suppress insurrrection or repel invasion. The manner in which he shall exercise these duties rests in his sole discretion. In these matters he is independent of the other departments; but numerous other duties assigned to him arise from legislation in which he may never have participated, or in relation to which he possessed only a qualified negative, and in the performance of which duties he has no discretion, but is subject, like every other citizen, to the law. In the distribution of powers, the Constitution only contemplates that different persons shall administer the different departments—that is, for example, that the Governor, or other member of the executive department, shall not at the same time be a Judge or a member of the Legislature. "When we speak," says Story, "of a separation of the three great departments of government, and maintain that that separation is indispensable to public liberty, we are to understand this maxim in a limited sense. It is not meant to affirm that they must be kept wholly and entirely separate and distinct, and have no common link of connection or dependence the one upon the other in the slightest degree. The true meaning is, that the whole power of one of these departments shall not be exercised by the same hands which possess the whole power of either of the other departments; and that such exercise of the whole would subvert the principles of a free Constitution." (Coms. on the Cons. 1 vol. sec. 525.)

To one or the other of the departments of government all the officers of the State belong. To the executive department belong all the numerous officers connected with the execution of the laws—including all persons engaged in the collection and disbursement of the public revenue. The Controller and Treasurer of the State are no more officers of that department than the Sheriffs and Tax Collectors of each county. The powers of each are limited and defined by the law, and

McCauley v. Brooks.

if either cannot be compelled by mandamus to perform a duty espe-
cially enjoined upon him by the law, in case of his refusal, none of
them can be.   Yet it will hardly be contended that a Sheriff could not
be compelled to execute a deed to a purchaser of real property at a sale
under execution, or a Tax Collector a deed to a purchaser at a tax
sale.   But if the position of the Attorney General be tenable, when
applied to the action of the Controller or Treasurer, it is equally so
when applied to the action of the other officers of the executive depart-
ment.   The powers of the Controller and Treasurer differ from the
powers of the other officers named only in their extent.   They do not
differ in their character as executive.   If the position be tenable, all
the officers of that department, in the discharge of their duties, are not
only beyond the reach of the compulsory process of the Courts, but are
independent of each other; or rather, the action of each is dependent,
for its efficacy, upon the construction which the others may place upon
the law as to their duties.   The fallacy of the doctrine becomes appar-
ent when it is thus tested.   If it could be sustained, our government
would cease to be one of law, and sink into merited contempt for its
utter inefficiency.   The truth is, no officer, however high, is above the
law, and when duties are imposed upon him, in regard to which he has
no discretion, and in the execution of which individuals have a direct
pecuniary interest, and there is no other plain, speedy and adequate
remedy, he can be required to perform those duties by the compulsory
process of mandamus.   This is the settled doctrine not only of the Fed-
eral Courts, but of the highest tribunal of nearly every State in the
Union where the question has been raised.

   In *Marbury* v. *Madison*, (1 Cranch, 137) the Supreme Court of
the United States held that a mandamus would lie to the Secretary of
State, to compel him to deliver a commission to a public officer, which
had been signed by the President.   In that case the writ was refused,
on the ground that the Court, except in a limited class of cases, only
exercised appellate jurisdiction, but the right to the commission and the
power of the proper tribunals to enforce its delivery were sustained.
Mr. Chief Justice Marshall, who delivered the opinion of the Court,
after speaking of the political powers with which the President is
clothed, and observing that in their exercise he is to use his own discre-
tion, and is responsible only to the country in his political character and
to his own conscience, said : " To aid him in the performance of these
duties, he is authorized to appoint certain officers, who act by his author-

ity and in conformity with his orders. In such cases their acts are his acts; and whatever opinion may be entertained of the manner in which executive discretion may be used, still there exists, and can exist, no power to control that discretion. The subjects are political. They respect the nation, not individual rights, and being intrusted to the executive, the decision of the executive is conclusive. The application of this remark will be perceived by adverting to the act of Congress for establishing the department of Foreign Affairs. This officer, as his duties were prescribed by that act, is to conform precisely to the will of the President. He is the mere organ by whom that will is communicated. The acts of such an officer, as an officer, can never be examined by the Courts. But when the Legislature proceeds to impose on that officer other duties; when he is directed peremptorily to perform certain acts; when the rights of individuals are dependent on the performance of those acts, he is so far the officer of the law, is amenable to the laws for his conduct, and *cannot at his discretion sport away the vested rights of others."*

In *Kendall* v. *The United States,* (12 Pet. 524) the same Court affirmed the judgment of the Circuit Court of the District of Columbia awarding a mandamus to the Postmaster General, directing him to credit the relators with the amount found due them by the Solicitor of the treasury, under a law of Congress, holding that the act required was purely ministerial, about which the Postmaster General had no discretion, and that in a case of that nature the writ of mandamus was the fit and appropriate remedy.

The doctrine of these cases has never been departed from, as supposed by counsel. The subsequent decisions in *Decatur* v. *Paulding,* (14 Pet. 497) and the *United States* v. *Guthrie,* (17 How. 284) are not in conflict with them. In the first case, the judgment of the Circuit Court refusing the writ was affirmed, on the ground as held by a majority of the Judges, that the act required of the Secretary of the Navy involved the exercise of discretion. Mr. Justices McLean and Story dissented, on the ground that the act was ministerial. Mr. Chief Justice Taney, who delivered the opinion of the Court, referred to the previous case and said: "The doctrines which this Court now hold in relation to the executive departments of the government, are the same that were distinctly announced in the case of *Kendall* v. *The United States* (12 Pet. 524)." In the second case, the judgment refusing the mandamus was sustained, on the ground that the writ was not a legal

remedy to try the title of the relator to the office he claimed.  Mr. Justice McLean dissented, and Mr. Justice Curtis filed a separate opinion, assenting to the judgment of the Court, but placing his assent entirely on the ground stated.  It is true, there are observations in the opinion of Mr. Justice Daniel which apparently question the doctrine previously established.  They seem, however, to be made with reference to disputed or controverted claims; for the opinion admits that it had been ruled that the power of the Courts of the United States by mandamus extended to such acts as are purely ministerial.  (See *Nougues* v. *Douglass,* 7 Cal. 66, *et seq.,* where these two cases are reviewed.)   In the case of the *State* v. *The Governor of Ohio,* (5 Ohio, 534) application was made for a mandamus to compel the Governor to issue his proclamation, setting forth that a banking association, organized as a branch of the State bank, of that State, was authorized to commence and carry on the business of banking, as he was required to do by the statute, when he was satisfied that the law providing for the incorporation of the association had been in all respects complied with; and the question was raised and considered by the Court, as to its power to control by mandamus the action of the Governor.  " Can the chief executive officer of the State," said the Court, "be directed or controlled in his official action by proceedings in mandamus?   It is claimed on the part of the defense, that inasmuch as the government is by the Constitution divided into the three separate and coördinate departments—the legislative, the executive, and the judicial—and inasmuch as each department has the right to judge of the Constitution and the laws for itself, and each officer is responsible for an abuse or usurpation in the mode pointed out in the Constitution, it necessarily follows that each department must be supreme within the scope of its powers, and neither subject to the control of the other, for the *manner* in which it performs, or its *failure* to perform, either its legal or constitutional duties.   This argument is founded on theory rather than reality.   That each of these coördinate departments has duties to perform in which it is not subject to the controling or directing authority of either of the others, must be conceded.  But this independence arises, not from the grade of the officer performing the duties, but the nature of the authority exercised.   Under our system of government, no officer is placed above the restraining authority of the law, which is truly said to be universal in its behests—' all paying it homage, the least as feeling its care, and the greatest as not exempt from its power.'   And it is only where the law has authorized

McCauley *v.* Brooks.

it, that the restraining power of one of these coördinate departments can be brought to operate as a check upon one of the others. The judicial power cannot interpose and direct in regard to *the performance* of an official act which rests in *the discretion* of any officer, whether executive, legislative or judicial. In *Marbury* v. *Madison,* (1 Cranch, 170) Chief Justice Marshall said: 'It is not by the office of the person to whom the writ is directed, *but the nature of the thing to be done,* that the propriety or impropriety of issuing a mandamus is to be determined.'

"The constitutional provision declaring that the 'supreme executive power of this State shall be vested in the Governor,' clothes the Governor with important political powers, in the exercise of which he uses his own judgment or discretion, and in regard to which his determinations are conclusive. But there is nothing in the nature of the chief executive office of this State which prevents the performance of some duties *merely ministerial,* being enjoined on the Governor. While the authority of the Governor is *supreme* in the exercise of his political and executive functions, which depend on the exercise of his own judgment or discretion, the authority of the judiciary of the State is *supreme* in the determination of all legal questions involved in any manner judicially brought before it. Although the State cannot be sued, there is nothing in the nature of the office of Governor which prevents the prosecution of a suit against the person engaged in the discharge of its duties. This is fully sustained by the analogy of the doctrine of the Supreme Court of the United States, in the case of *Marbury* v. *Madison* (1 Cranch, 170)."

"However, therefore, the Governor, in the exercise of the supreme executive power of the State, may, from the inherent nature of the authority in regard to many of his duties, have a discretion which places him beyond the control of the judicial power, yet in regard to a mere ministerial duty enjoined on him by statute, which might have been devolved on another officer of the State, and affecting any specific private right, he may be made amenable to the compulsory process of this Court by mandamus."

Whatever influence might be given to political reasons alone—arising from other duties to be performed by the Governor, assigned to him by the Constitution—as to the mode and manner in which obedience to the process of the Court would be enforced against him, such reasons can have no place for consideration when obedience to the mandate is required from inferior officers of the executive department. These

McCauley *v.* Brooks.

political reasons would, with reference to the Governor, seldom practically arise for consideration; for it is not to be supposed that the highest executive officer of the State, acting under his oath to support the Constitution and laws, would refuse to perform a duty which the highest tribunal had declared imposed upon him by that Constitution, or by those laws. It is not to be believed that he would attempt to exercise any despotic power, and in the expressive language of Chief Justice Marshall, "sport away the vested rights of others." (See *Bonner* v. *The State of Georgia*, 7 Geo. 481.)

In *Page* v. *Hardin*, (8 B. Monroe, 649) the Supreme Court of Kentucky affirmed the judgment of the Circuit Court of that State, awarding a mandamus to the Second Auditor of the State to compel him to issue his warrant in favor of the Secretary of State, for the salary of the latter for a quarter of a year. In the opinion delivered in that case, which is characterized by great ability, the Court said: "The judiciary pretends to no direct control over the action of the Legislature or of the supreme executive. But it may decide upon the validity of the acts of either affecting private rights. And by the writ of mandamus, it may coerce a ministerial officer, though of the executive department, to the performance of a legal duty for the effectuation of a legal right. It must decide all questions essential to a determination of the rights of the parties in a judicial proceeding coming properly before it. The present proceeding is, as we have seen, one of that character. There is nothing in the nature of the questions presented in the petition and response to repel the jurisdiction of the Court, or to remove the case from the sphere of the judicial power."

In *Smith* v. *The Controller of the State*, (18 Wend. 659) the Supreme Court of New York awarded a mandamus to the Controller, commanding him to issue his warrant to the Treasurer to pay to the relator the balance collected by the agents of the State, and paid into the treasury as tolls of the Albany basin, though the balance was retained under the order of the Commissioners of the Canal Fund.

The same Court has in repeated instances ordered a mandamus to the Controller of that State, and to the Controller of the city of New York, to compel those officers to issue their warrants. (See also *People* v. *Morris*, 15 Barb. 529; *People* v. *Flagg*, 16 Id. 503; *People* v. *Edmonds*, 19 Id. 468; *People* v. *Stout*, 23 Id. 339.)

This jurisdiction in the Superior Courts is as well settled as any proposition of law can be. It is everywhere recognized as inherent in

those Courts, and that its exercise is essential to the due administration of justice.

In our own Court there have been repeated adjudications asserting the same power. In *Fowler* v. *Pierce*, (2 Cal. 165) the District Court was directed to award a peremptory mandamus to the Controller, commanding him to audit the account of a member of the Legislature, whose compensation was fixed by law. In delivering the opinion of the Court, Chief Justice Murray said: "The nature and amount of the services are ascertained (or not disputed) and the law has fixed the compensation. The Controller, who is bound to know the law by which he is required to act, has no discretion in such a case. Nothing remains to be ascertained. He must audit the account according to the law in force; and it will be no sufficient answer to a mistake or refusal on his part, to say he acted according to his discretion. The act of auditing an account under circumstances like these becomes merely ministerial, and can be enforced by mandamus. The objection that this is an indirect mode of suing the State, is not substantial. The Legislature have neglected as yet to pass any law giving general creditors of the State a remedy for enforcing their demands. But for the purpose of carrying on the State government, provision has been made for the payment of officers and certain expenses of the State; and when the Legislature have fixed the amount of compensation, the fund out of which it shall be paid, and imposed the duty of auditing and paying the same on any officer or officers, they have given a remedy in that case which may be enforced by the Courts of the State."

In *The People ex rel. McDougall* v. *Bell*, (4 Cal. 177) the District Court was ordered to issue a mandamus to the Controller to compel him to correct an error in the auditing of an account. "It is not now denied," said the Court, "that mandamus may be resorted to by the superior tribunal to compel an inferior officer to do the act which is sought to be enforced, in all cases where the officer has *no discretion*, and where he is under obligation to do the specific act; on the contrary, the general rule as adopted by recent decisions is, that whenever the principles of substantial justice require that a certain act should be done, and there is no adequate remedy in the ordinary course of law, the Superior Court will inquire into the matter, and administer the proper remedy by directing the officer to do that which justice requires; and this is upon the recognized maxim that there cannot be a wrong without a remedy."

McCauley v. Brooks.

In *The People* v. *Whitman*, (6 Cal. 659) the District Court was instructed to award the writ to the Controller, commanding him to draw his warrants on the Treasury in favor of the relator for compensation due the latter as Supreme Court Reporter.

It is unnecessary to pursue this matter further. We have examined the question of power, and the other questions raised in the case at great length—not that we have considered them as presenting any novel or difficult principles—but in the hope that we might be able to put at rest forever the protracted controversy between the parties representing the lessee of the prison and the officers of the State. Rights of property once vested under contracts, whether between individuals or between the State and individuals, cannot be frittered away by legislation. They have the protection of both the Federal and State Constitutions. If the State desire to resume the possession of the State prison, and the control of the convicts, she can do so only in one way—by compensation, as is required in all cases where private property is taken for public use. The leasehold interest is as much property for which compensation is to be made before it can be subjected to the uses of the State, as are lands held in fee. If the State has cause of complaint from the mismanagement of the prison, or any disregard of the stipulations of the contract, she must seek her redress, as individuals in like cases are required to do, by proceeding upon the bond executed as security for the performance of the contract.

It is our judgment that the mandamus should issue. In enforcing it, no inconvenience to the public service will be produced. The contract only gives the right to have the warrants paid out of the moneys in the treasury not otherwise appropriated. When the warrants are presented to the Treasurer, it will be his duty to apply to them the unappropriated moneys in the treasury, and to continue to apply such moneys as they are from time to time received, until the warrants are fully paid. The appropriation for the warrants is made in the usual form.

The judgment of the District Court must be reversed, and that Court directed to issue a peremptory mandamus to the Controller of the State to issue his warrants to the Treasurer in favor of the relators pursuant to their application; and it is so ordered.

The Attorney General filed a petition for a rehearing on the part of the respondent; and at the same time the relators applied for a modification of the judgment rendered, so that it might order the writ to issue directly from this Court instead of being remitted to the District Court.

On the petitions, FIELD, C. J. delivered the opinion of the Court— COPE, J. concurring.

The Attorney General has filed a petition for rehearing in this case, and from a regard to the importance of the questions involved, and not from any new considerations presented, we have carefully reviewed our former opinion.    We have felt a natural solicitude to advance only such doctrines as are supported by sound reason, and are in accordance with the fundamental principles of the Constitution and good government. It is not true, as asserted, that we have claimed the power to dispose of the funds of the public treasury in opposition to the declared will of the Legislature..  Nothing can be more unfounded than this assertion.    We have advanced no such pretension.    We have simply undertaken, as was our duty under the Constitution, to declare, in a judicial proceeding, what the law is—what obligations the State has assumed by her contract, and decreed that the officers of the State shall yield obedience to the will of the State, and carry out her stipulations.

On the twenty-first of March, 1856, the Legislature passed an act authorizing and requiring the Commissioners of the State prison to lease the State prison grounds and property, with the labor of the convicts, for a period of five years, at a price not exceeding $15,000 a month, and appropriated that sum per month, or such sum per month less than that amount as might be agreed upon with the lessee, out of any money in the treasury not otherwise appropriated, to meet the obligations of the contract on the part of the State, and authorized and required the Controller to draw his warrants on the Treasurer for the same, and directed the Treasurer to pay the warrants on the application of the lessee at the end of each month.    The contract with the lessee was made for a less sum : namely, for $10,000 a month—and as to the payments which it provides, purports to follow the exact terms of the act. Previous to its execution, and from the first of June, 1855, the administration of the State prison had been under the immediate control of the officers of the State, under the provisions of the Act of May 7th, 1855.    The results of that administration are stated in the message of the Governor to the Assembly, accompanying the approval of the Act of March 21st, 1856, under which the contract was made.    (Assembly Journal of 1856, 553.)    By that message it appears, that from June 1st, 1855, to January 1st, 1856, the expenditures for State prison purposes, (including the construction of the prison wall) over and above

the amount received from the sale of brick manufactured during the period, amounted to the sum of $382,226.84, being an average sum of $54,605.83 per month. The cost of the wall was $180,235.09, which being deducted from the amount of the expenditures, left us the expenses of keeping the convicts, over and above the receipts of their labor, the sum of $28,855.96 a month. (Senate Journal of 1856, 375.) It also appears by the message that, according to a statement furnished by the Board of Directors, the expenses of the prison from the first of January to the first of April, 1856, would amount to the sum of $76,458.02, being a monthly average of $25,486; and that the aggregate of expenditures for ten months, exclusive of the proceeds of the prison labor, amounted to the enormous sum of $458,684.86, being a monthly average of $45,868.48. Deducting the cost of the prison wall, and the monthly average amounted to $27,844.97. It was under these circumstances, with the results of the administration of the prison by the officers of the State before the Legislature, that the law of March 21st, 1856, was passed, and the contract with the lessee was made. By the contract, not only were the expenses reduced nearly two-thirds a month from what they were previously, but a release was obtained of a claim against the State of $48,800 for property purchased by the State Prison Directors, or other State officers, and of a claim for upwards of 2,000,000 of brick furnished for the prison wall. These observations, however, address themselves to the policy and expediency of the contract, with the consideration of which we have properly nothing to do. To the form of the contract and its assignable character, objections might with reason have been taken; but such was not the case. No objections of the kind were made. The contract was adopted and acted upon by the State, and thereby affirmed. It was recognized by subsequent legislation, and referred to in the subsequent message of the Governor. That contract is a valid contract, and binding upon the State. By it the State leases the prison grounds and property, with the labor of the convicts, for the period of five years, and agrees, in the most solemn form, that the lessee shall receive warrants for the stipulated sum, and the Treasurer shall pay them at the end of each month, during the term, out of moneys in the treasury not otherwise appropriated. Under that contract, and reposing upon the faith of the State, the lessee and those representing him have received the convicts sent to the prison for the punishment of crimes, in the administration of the penal laws of the State, have kept them, fed them and clothed them. The State holds the lessee and his

representatives to the obligations of the contract. She has never in the slightest degree discharged him or them from those obligations. On the contrary, she is daily sending to their care through her Courts, in the administration of her laws, persons convicted of the higher crimes. Through her Courts she condemns convicts to servitude in the prison kept under the contract, and pays for their transportation to that place; and yet, since the twenty-sixth of December, 1857, nothing has been paid to the lessee or those representing him under the contract. The burdens of the contract, involving the support of about six hundred convicts, are daily imposed upon those representing the lessee, and yet for the last thirty months there has been no corresponding discharge of the obligations on the part of the State.

And what is the pretense for asserting that the State has repudiated the contract, or is discharged from its obligations? Simply that the Legislature has repealed the law under which the contract was made. But what has that repeal to do with the case? The contract once made did not depend for its further existence upon the continuation of the act which originally authorized its execution. The authority under the law was exercised; the power of the Commissioners was exhausted, so far as the leasing of the prison and convict labor was concerned, when the contract was signed and accepted. The law had in that respect effected its purpose, and it was of no consequence whether it was suffered to remain any longer on the statute book or was repealed. A contract once made cannot be impaired, much less destroyed, by subsequent legislation, without violation of both Federal and State Constitutions. Nothing is clearer or better settled than this. If the Legislature could destroy a contract entered into by the State by the repeal of the law which authorized it, no contract could ever be made binding upon the State. The performance of the stipulations of any contract on her part, and the obligations to such performance, would depend purely upon the will of the Legislature. Such a proposition cannot be maintained. To assert it is to assert, in effect, that a principal who authorizes his agent to enter into a contract can set aside such contract, after it has been duly made, by revoking his power of attorney. The Act of March 21st, 1856, was the authority, the power of attorney, to the agents of the State to make the contract with the lessee; and the repeal, like the revocation by the principal of a power of attorney to his agent, cannot impair, much less destroy, the contract previously made.

We deny the proposition laid down in the petition of the Attorney

McCauley *v.* Brooks.

General, " that the State has the right of repudiation, and did repudiate the demand (of the relators) by her repealing Act of 1859." We deny both the right to repudiate and the fact of repudiation. The State possesses no such right, but upon her rest the same obligations to do justice and keep faith as rest upon individuals. She cannot be sued, it is true, and hence demands against her must await the action of the Legislature in the appropriation of moneys for their payment. In that sense the Legislature possesses the power to postpone her general creditors indefinitely; in that sense only can the State repudiate; but the right and the power are not synonymous terms. The exercise of the power would never convert that power into a right. We deny the fact of the repudiation of the demand of the relators. By no act has the State said that she repudiated that demand. The repeal of the law, the revocation of the power of attorney under which the contract was made, did not, as we have already observed, affect the contract previously made. That contract remains as a subsisting and living thing, and through her Courts and officers the State every day recognizes its existence and obligatory force upon the relators representing the lessee.

· Reference must be had to a power of attorney revoked in considering a contract made before the revocation. Reference must in like manner be had to a repealed law in considering a contract made under its provisions whilst it was yet in force. The contract refers to the law which authorized it. By the contract the State covenants, upon the considerations therein specified, to pay the lessee at the end of each month, during the continuance of the term of five years, the sum of $10,000, "in conformity with the law regulating the Board of said Commissioners and defining their powers and duties"—that is, that the Controller shall issue to the lessee his warrants upon the Treasurer, and the Treasurer shall pay them at the end of each month out of moneys not otherwise appropriated. This the State agrees the Controller and Treasurer shall do each month. This the State still says these officers shall do. The contract gives to the relators representing the lessee the right to the warrants and the right to have any unappropriated moneys in the Treasury applied towards their payment. Having this right, it would be a reproach to the jurisprudence of the State if the laws of the the country furnish them no remedy when the right is withheld. This brings us to the consideration whether the right of the relators can be enforced by mandamus.

In our former opinion we examined at great length the power to

enforce by mandamus the performance of the legal duty devolving upon the Controller. We have seen nothing since which has created a doubt of the correctness of the views we then expressed. We refer to the subject again, however, because of the absolute necessity of the power asserted to the due administration of justice, and to the existence of the Government as a Government of laws. In *Marbury* v. *Madison*, (1 Cranch, 50) from which we then cited, the Supreme Court of the United States held that the relator was entitled to his commission as Justice of the Peace in the District of Columbia, to which office he had been appointed, and the commission for which had been signed by the President and sealed by the Secretary of State, and that to withhold the commission was an act not warranted by law, but violative of a vested legal right, and then proceeded to consider whether the laws of the country afforded him a legal remedy. "The very essence of civil liberty," says Chief Justice Marshall, who delivered the opinion of the Court, " certainly consists in the right of every individual to claim the protection of the laws whenever he receives an injury. One of the first duties of Government is to afford that protection. In Great Britain the King himself is sued in the respectful form of a petition, and *he never fails to comply with the judgment of his Court.*" And again: "The Government of the United States has been emphatically termed a Government of laws and not of men. It will certainly cease to deserve this high appellation if the laws furnish no remedy for the violation of a vested legal right. If this obloquy is to be cast on the jurisprudence of our country, it must arise from the peculiar character of the case." The Chief Justice then shows that there is nothing in the character of the case or the nature of the transaction which excepts it from legal investigation or excludes the injured party from legal redress, and as instances of cases where the performance of duties imposed upon the heads of the departments may be enforced, refers to the Act of 1794, concerning invalids, and the Act of 1796, authorizing the sale of lands above the mouth of Kentucky river. "By the act concerning invalids, passed in June, 1794," says the Chief Justice, "the Secretary of War is ordered to place on the pension list all persons whose names are contained in a report previously made by him to Congress. If he should refuse to do so, would the wounded veteran be without remedy? Is it to be contended that where the law in precise terms directs the performance of an act, in which an individual is interested, the law is incapable of securing obedience to its mandate? Is it on account of the character

McCauley *v.* Brooks.

of the person against whom the complaint is made? Is it to be contended that the heads of departments are not amenable to the laws of their country? Whatever the practice on particular occasions may be, the theory of this principle will certainly never be maintained. No act of the Legislature confers so extraordinary a privilege, nor can it derive countenance from the doctrines of the common law.　＊　＊　By the act passed in 1796, authorizing the sale of lands above the mouth of Kentucky river, the purchaser, on paying his purchase money, becomes completely entitled to the property purchased; and on producing to the Secretary of State the receipt of the Treasurer upon a certificate required by the law, the President of the United States is authorized to grant him a patent. It is further enacted that all patents shall be countersigned by the Secretary of State, and recorded in his office. If the Secretary of State should choose to withhold this patent, or, the patent being lost, should refuse a copy of it, can it be imagined that the law furnishes to the injured person no remedy?"

" *It is not believed that any person whatever would attempt to maintain such a proposition.*"

"It follows, then, that the question, whether the legality of an act of the head of a department be examinable in a Court of justice or not, *must always depend on the nature of that act.*"

Throughout the whole opinion the Court disclaims all pretension of jurisdiction to intermeddle with the prerogatives of the Executive, or to interfere with the political powers with which the heads of the departments are clothed. "The province of the Court," continues the Chief Justice, "is solely to decide on the rights of individuals, not to inquire how the Executive, or executive officers, perform duties in which they have a discretion. Questions in their nature political, or which are by the Constitution and laws submitted to the Executive, can never be made in this Court."

"But if this be not such a question; if, so far from being an intrusion into the secrets of the Cabinet, it respects a paper which, according to law, is upon record, and to a copy of which the law gives a right on the payment of ten cents; if it be no intermeddling with a subject over which the Executive can be considered as having exercised any control, what is there in the exalted station of the officer which shall bar a citizen from asserting in a Court of justice his legal rights, or shall forbid a Court to listen to the claim, or to issue a mandamus directing the performance of a duty, not depending on executive discretion, but on particular acts of Congress and the general principles of law?"

"If one of the heads of departments commits any illegal act, under color of his office, by which an individual sustains an injury, it cannot be pretended that his office alone exempts him from being sued in the ordinary mode of proceeding, and being compelled to obey the judgment of the law. How, then, can his office exempt him from this particular mode of deciding on the legality of his conduct, if the case be such a case as would, were any other individual the party complained of, authorize the process?"

"*It is not by the office of the person to whom the writ is directed, but the nature of the thing to be done,* that the propriety or impropriety of issuing a mandamus is to be determined. Where the head of a department acts in a case in which executive discretion is to be exercised, in which he is the mere organ of executive will, it is again repeated, that any application to a Court to control, in any respect, his conduct, would be rejected without hesitation."

"But where he is directed by law to do a certain act affecting the absolute rights of individuals, in the performance of which he is not placed under the particular direction of the President, and the performance of which the President cannot lawfully forbid, and therefore is never presumed to have forbidden; as for example, to record a commission, or a patent for land, which has received all the legal solemnities, or to give a copy of such record; in such cases it is not perceived on what ground the Courts of the country are further excused from the duty of giving judgment, that right be done to an injured individual, than if the same services were to be performed by a person not the head of a department."

We have made these lengthy citations from the opinion of the Supreme Court of the United States, because they present with admirable clearness and precision the views on the subject under consideration which are entertained with rare exceptions by the legal profession and the judiciary throughout the entire Union.

Where political power is vested in a public officer, he is responsible only in his political character to the country. Where discretion is vested in him, he but conforms to the law in exercising that discretion. But where a question of political power is not involved, where no discretion exists, but a specific legal duty is imposed, ministerial in its character, such as the issuance of a patent, the delivery of a commission, the payment of a specific sum, or the drawing of a particular warrant, and in the performance of that duty individuals have a direct pecuniary inter-

McCauley *v*. Brooks.

est, the officer, like any other citizen, is subject to the process of the regularly constituted tribunals of the country. If this be not so, then the officer can " sport with the vested rights of others," and the government will cease to deserve the " high appellation " of being a government of laws, and the " obloquy " referred to by Chief Justice Marshall will be cast upon the jurisprudence of the country.

The Controller of the State is an officer of the executive department, but the greater part of the duties devolved upon him by the law are of a ministerial character. The Constitution does not define his duties. It only provides that there shall be such an officer, declares that he shall be subject to impeachment, the mode of his election, and that his compensation shall not be increased or diminished during his term of office. He does not hold his appointment of the Governor, is not responsible to him, and acts entirely independent of him. His duties are enumerated and defined by the law, and they are, as we have said, generally of a purely ministerial character. He has no discretion as to the issuance of warrants for appropriations for the public service. He has no discretion to refuse his warrants for the salaries of the Governor and Judges, upon any notions that such matters rest in his discretion, and that in his judgment those officers have not performed their duties. He cannot undertake to say that in his judgment the capitol ought not to be erected at Sacramento, and therefore, in the exercise of his discretion, refuse the warrants for the appropriation made by the law. But if he cannot do this in the cases supposed, he cannot do it in any case where a specific ministerial duty is enjoined. But it is clear, it is asserted, that in those cases the law requires the issuance of the warrants, and it is not so clear in the present case. That may be a very good reason for the Controller to ask in the present instance the judgment of the Court upon the question as to what the law is; but the law being determined, the obligation becomes as clear and certain and imperative as in the cases enumerated. But it is further said, that to issue a mandamus to the Controller will be a great hardship to him, as he may be indicted under the statute for issuing the warrants in obedience to the Court, and be impeached by the Legislature. To this the answer is ready and complete. In the first place, there is no statute which forbids the issuance of the warrants, but on the contrary, the State, by her contract still subsisting and in force, directs and requires him to issue them. In the second place, the proposition of a possible impeachment is preposterous. The Legislature has declared that an officer, for willful

disobedience to the mandate of the Court, shall be deemed guilty of a misdemeanor in office, (Practice Act, sec. 479) and it would be a most unjust imputation upon the character of any legislative assembly to suppose, in the face of such a declaration, that it would present any articles of impeachment against an officer for yielding obedience to the law. The Legislature has undoubtedly the power—the physical power, so to speak—to impeach any officer; the Governor for vetoing a bill—the Judges for rendering a decision. So it has the power to impose a tax amounting to the entire value of the property upon which it is levied; but the possession of this power does not justify the supposition that it will be arbitrarily and tyrannically exercised. It is to be assumed in all cases of this kind that the members of the Legislative Assembly will be governed by sentiments of justice, and the ordinary rules of common sense which influence members of a civilized society. So a grand jury possesses the power to indict any one; but will it do it without proper evidence? Will it say that A killed B whilst B is still living? The possibility of a tyrannical exercise of power against a public functionary for the discharge of his duties, is no excuse for the neglect of those duties. But it does not appear to have occurred to the counsel of the respondent, that if the issuance or refusal of warrants was a mere executive act, resting in the discretion of the Controller, he possesses an inviolability from all personal responsibility for any breach of duty. Acts which are discretionary are not the subjects of indictment or impeachment. For the exercise of discretion, allowed by the law, or necessarily incident to his office, he could never be held accountable. An unwise exercise of discretion there may be; but unless there be an ingredient of corruption or turpitude of some kind, there can be no ground for any criminal proceedings either before the Courts or the Legislature.

Again, the Controller is required to give a bond for the faithful performance of his duties, and all parties injured or aggrieved by the wrongful act or default of the officer, may institute suits thereon in their own names. (Act concerning Controller, of January 19th, 1850; and concerning Official Bonds, of February 9th, 1850.) But what relief can injured parties have upon such bond, if the acts of the Controller are matters resting in his discretion? The Controller may refuse a warrant to which an individual is entitled, and when suit is instituted for such refusal the answer would be made: "I am an executive officer; I am independent of the Courts; the issuance of that warrant was a matter

McCauley v. Brooks.

resting in my discretion; I differ with the tribunals established for the construction of the law; I am sole judge in this matter"—and the answer would be perfect and conclusive. If the act alleged as a breach of the bond was a matter of executive discretion, that fact alone would be a complete determination of the suit. It is to such results that the preposterous claim asserted on behalf of the Controller must necessarily lead.

"It is not by the office of the person," says the Supreme Court of the United States, "to whom the writ is directed, *but the nature of the thing to be done,* that the propriety or impropriety of issuing a mandamus is to be determined." The nature of the things to be done by the Controller is similar to the nature of the things to be done by the Auditors of the counties, and whatever immunities he possesses they possess. The duties of the two officers, though specifically different, are similar in their general nature. So the duties of the several County Treasurers are similar in their general nature to the duties of the Treasurer of the State, and those officers possess like immunities. Yet it would be a startling proposition that the Auditors and Treasurers of the several counties are wholly irresponsible to the law, or to aggrieved individuals for their errors, or for the abuse of their official trusts.

But it is only to the executive officers of the State, it is said, that this exemption from the legal process of the Court applies. The argument does not, however, stop with them. It establishes also the immunity of the county officers, if it establishes anything; for it is by the nature of the thing to be done, and not by the office of the person, that the propriety or impropriety of issuing a mandamus is to be determined.

In our former opinion, we stated that to the executive department belong all the numerous officers connected with the execution of the laws, and such is certainly the case; for the powers of the government, by whomsoever exercised, must belong to the one or the other of the three departments. If the officers do not belong to the judiciary or legislative department, they must fall under the executive department. The duties of the officers of the latter class are sometimes purely executive in their character, and sometimes purely ministerial. So far as they are of the latter character, they must—if law is to be administered and rights protected—be subject to enforcement by judicial proceedings. We will suppose, however, for the present, for the purposes of this case, that only certain officers of the State—the Governor, Secretary of State, Controller, Treasurer, Surveyor General, and Attorney General

—belong to the executive department; a supposition which has no warrant in the Constitution; and then test the doctrine of the respondent by the practical results to which it may lead. We will take for illustration the case of a person elected to the office of District Judge of the district of Sacramento. The proper certificate of the election is transmitted to the Secretary of State, and by him to the Governor. The latter officer signs a commission for the Judge elect, and hands it to the Secretary of State, that the seal of the State may be affixed and the commission then delivered. The Secretary of State, though appointed in the first instance by the Governor, is not responsible to that officer, but is independent of him. He is of opinion that the law authorizing the election was not constitutionally passed, or that the election was invalid, or that the candidate returned was ineligible, and he therefore declines, in the exercise of his discretion, to deliver the commission. Application is made to the Court for a mandamus to compel the delivery, but the writ is refused, for the act of delivery is an executive act, which is beyond the control of judicial proceedings. Suit is then brought upon the Secretary's bond for the refusal, by the aggrieved party, but the act being discretionary constitutes no breach of official duty, and judgment passes in favor of the Secretary. Complaint is finally made to the Legislature, and an investigation is ordered, and perhaps articles of impeachment are presented; but to both the ready answer is given— " The act of which complaint is made was of an executive character, resting in the discretion of the officer, and for an erroneous exercise of discretion—there being in it no ingredient of corruption or turpitude of any kind—no criminal proceedings either in the Courts or before the Legislature can be maintained." To punish for an unwise or erroneous exercise of discretion would be an act of simple tyranny. The impeachment would of course fail. In the meantime the Judge elect is deprived of his office, in which he has a vested right, and of its honors and emoluments; the people of the district are deprived of his services, their will is defeated, and they are subjected to the necessity of submitting to the exercise of judicial authority by an incumbent not of their choice, and who, it may be, for the most important public considerations, ought not to be retained in power. But we will take one step further; we will suppose the commission is delivered. The Judge enters upon the duties of his office, and at the end of the month applies to the Controller to issue a warrant for his salary. The Controller is not responsible to the Governor or Secretary; he is independent of both, and he enter-

tains doubts as to the law directing the election and the qualifications of the candidate, and he therefore declines, in the exercise of *his* discretion, to issue his warrant. The same proceedings for a mandamus, and upon the officer's bond, and before the Legislature, as in the case of the Secretary's refusal to deliver the commission, are taken, and with the like result. In the meantime the Judge is deprived of his salary, which may constitute the only means of support for himself and family, and yet he is at the same time prohibited from the practice of his profession, perhaps to him the only other source of livelihood. He must resign his office, or await some providential influence upon the Controller's mind, by which the latter's views of his discretionary duty may be changed. But we will take still another step; we will suppose the warrant is issued and is presented to the Treasurer for payment. The Treasurer is not responsible to the Governor, the Secretary of State or the Controller. He is independent of all those officers, and he has doubts as to the validity of the election, or the right of the incumbent to the office, and he therefore declines, in the exercise of his discretion, to pay the warrant. The same proceedings by mandamus, and upon his bond, and before the Legislature, are instituted, as in the case of the Secretary's refusal to deliver the commission, and are followed by the same result. Thus the will of the people of the district may be defeated, and the purposes of the law evaded, and the vested rights of the Judge essentially impaired, by any one of these three officers of the executive department, upon the pretentious claim that the performance of the acts, which the law specifically enjoins upon them, is a matter resting in their discretion, for which they are not responsible to the law, but are above and independent of it.

Let us take another case to illustrate the practical results of the doctrine asserted. At its last session the Legislature passed an act for the construction of a State capitol at Sacramento, and appropriated $100,-000 out of any moneys in the treasury not otherwise appropriated to carry the act into effect, and authorized the Commissioners designated therein to enter into contracts for the work, and to draw orders from time to time, as the services provided are performed, upon the Controller, and directed that officer to draw his warrants upon the Treasurer for the amount of such orders. We will suppose the Commissioners have made the contract for the construction of the capitol, that the contractor has entered upon the performance of the contract, and commenced the erection of the building, and orders for the work performed

are drawn upon the Controller, and application is made to him for his warrants. The issuance of the warrants is an executive act, resting in the discretion of the officer, and he has doubts as to the passage or construction of the statute, or the validity of the contract made thereunder, and he declines to give the warrants. He cannot be compelled to perform this duty by mandamus, and the mere erroneous exercise of his discretion is not a breach of his official bond, or the ground of criminal proceedings. The result follows—the work must cease, and the law for the year, at least, be practically defeated.

We might proceed and show that the doctrine asserted leads directly to the subversion of the rights of individuals, the derangement of the appropriations for the public service, the defeat of the will of the people, and practically gives to the officers of the State in the executive department, an absolute veto upon the most important legislation of the State. If such be in fact the constitution of our government, and the effect of the division of its powers into three departments, the government is not one of laws, and it is not worth a struggle for its preservation. There is something repugnant to all just notions of good government and of civil liberty, in the claim that these executive officers of the State, in matters purely ministerial, are supreme in their respective departments; that they can give effect or not, at their discretion, to the appropriations of the Legislature, and thus advance or suspend at their will the public works, and that they can pass absolutely upon the rights of individuals, without hearing, or any of the formalities provided for the protection of such rights. An impeachment could not be sustained, as we have said, if his acts are matters of discretion; but suppose it could be sustained, that result would not afford to the injured individual his remedy. The impeachment is for the punishment of the officer, and not for the redress of the private citizen.

The case may arise when the Controller will deny that the incumbent of the office of Treasurer is properly in office, and refuse to issue his warrants upon him, or the reverse may occur, and the Treasurer may deny that the incumbent of the Controller's office is entitled to his place, and refuse to acknowledge the validity of any warrants drawn by him. Who is to decide in cases of this kind? Has the judiciary no power to determine the matters in controversy? Again: the case may occur—and unfortunately for California, it has on one occasion, at least, occurred already—that the Treasurer may attempt to remove the funds to some other place than the capital—out, perhaps, of the State—for the alleged

McCauley *v.* Brooks.

purpose of more conveniently meeting the obligations of the State; and will it be pretended that no process in restraint of such proceedings can issue from the Courts? If the acts of the Treasurer are matters resting in his discretion—if they are executive merely—and for which the officer is responsible only to the Legislature, the funds may be removed. The Courts cannot interfere, and before the Legislature can meet, the funds may be hopelessly lost to the State. These, it may be urged, are extreme cases; but if the Courts cannot compel any acts to be performed by the Treasurer, because all his acts are matters of discretion, they cannot restrain the performance of any acts by him, for the like reason.

We have supposed, for the purpose of illustrating the practical effect of the doctrine asserted by the respondent, that the exemption from legal control in matters ministerial, is limited to those who are specially termed State officers, though we have shown that immunities, if existing, as to them, must extend in like manner to all the officers of the executive department. This being the case, the administration of the government would for all useful purposes be dissolved. All officers of that department, upon that doctrine, would be and are independent, not only of all process of the Courts, but of each other; or rather, the action of each is dependent for its efficacy upon the view which the others may take of their own duties. If this doctrine can be maintained, the government must cease to be one of law, and must sink into merited contempt for its weakness and inefficiency.

In our former opinion, we stated that the doctrine that the officers of the government can be compelled, by the compulsory process of mandamus, to the performance of mere ministerial duties, was held not only by the Federal Courts, but by the highest tribunal of nearly every State where the question has been raised. Since then our attention has been called to the case of *Guthrie* v. *The United States*, (17 How. 284) as though we had misapprehended its effect, and to the case of *Devine* v. *Harvey* (7 Monroe, 440) as in conflict with our views. In speaking of the case of *Guthrie* v. *The United States*, we stated that the judgment of the Circuit Court refusing the mandamus was sustained on the ground that the writ was not a legal remedy to try the title of the relator to the office he claimed; that it is true, there are observations in the opinion of Mr. Justice Daniel, which apparently question the doctrine previously established by the Court, but that they seem to have been made with reference to disputed or controverted claims; for the opinion

admits that it had been ruled that the power of the Courts of the United States, by mandamus, extended to such acts as are purely ministerial. We have again looked into the case, and we find that the statement as to the views of Mr. Justice Daniel is correct, and that the opinion delivered by him was the opinion of a minority of the Court. At the time, the Court consisted of nine Judges, one of whom, Mr. Justice McLean, was of opinion that the mandamus should issue; and four of whom, Justices Curtis, Nelson, Grier and Campbell, placed their concurrence in the judgment of affirmance on the ground that the writ was not a legal remedy to try the title of the relator to the office claimed, and expressly reserved the expression of an opinion upon any other question argued. If, therefore, the case do not decide the proposition we have stated, it decides nothing. Certain it is, that the particular views advanced by Mr. Justice Daniel were not entertained, or at least were not concurred in, by a majority of the Court. In *Devine* v. *Harvey*, the Legislature of Kentucky had allowed a certain sum to Devine, and a creditor having judgment against him endeavored to subject the claim, by bill in equity, to the satisfaction of the judgment, making Devine, and the Auditor and Treasurer of the State, parties. The bill was filed under an act of the State authorizing a proceeding of that nature to subject any choses in action belonging to a judgment debtor after execution had been returned unsatisfied. The Court held that the bill would not lie, and that the Auditor and Treasurer were not proper parties, "but as Devine might have proceeded by mandamus against the Auditor and Treasurer to compel them to pay this money out of the treasury, in case of their refusal," it might be urged that the claim was, within the spirit of the terms, chose in action, and the equity of the act, were it not for the rule of law that the Commonwealth is not embraced by an act which is made to operate between individuals, where there is nothing in the act showing an intention to that effect; and that by the act in question it was not the intention of the Legislature to include the State in the class of debtors who could be compelled to pay their debts to the creditors of their own creditors. This case, so far from being in conflict with our views, expressly recognizes the authority of the Court to issue a mandamus to the Auditor and Treasurer of the State to enforce the payment of a claim allowed by the Legislature.

In our former opinion, we referred to several adjudications of this Court, asserting the power of the District Court to issue a mandamus to the Controller of the State to enforce the performance of a minis-

McCauley *v.* Brooks.

terial act enjoined upon him by the law; to *Fowler* v. *Pierce*, (2 Cal. 165) in which that Court was directed to issue the writ commanding him to audit the account of a member of the Legislature whose compensation was fixed by law; to *People ex rel. McDougall* v. *Bell*, (4 Cal. 197) in which it was ordered to award the writ to compel him to correct an error in the auditing of an account; and to *People* v. *Whitman*, (6 Cal. 659) in which it was instructed to allow the writ commanding him to draw his warrants on the Treasurer for compensation due the relator as Supreme Court Reporter. The legislative recognition of this power of the Court has been in accordance with the adjudications on the subject. In the act passed at the first session of the Legislature, organizing the District Courts, it is expressly provided that " they shall have power to issue and direct writs of *mandamus, prohibition, quo warranto, habeas corpus, ne exeat* and all other writs and processes to Courts of inferior jurisdiction, and to corporations and individuals, which shall be necessary *to the furtherance of justice and the regular execution of the laws.*" (Laws of 1850, ch. 33, sec. 8.) In the act to regulate civil proceedings, passed in 1851, a chapter is devoted exclusively to the subject of mandamus. The four hundred and sixty-seventh section of the act provides that the writ may be " issued by any Court in this State except a Justice's, Recorder's or Mayor's Court, to any inferior tribunal, corporation, board or person, to compel the performance of an act which the law specially enjoins as a duty resulting from an office, trust or station." That it was in contemplation of the Legislature that the writ might be issued to officers of the State, is evident from the provisions made in section four hundred and seventy-nine in case of disobedience to the mandate. That section reads as follows : " When a peremptory mandate has been issued and directed to an inferior tribunal, corporation, board or person, if it appear to the Court that any member of such tribunal, corporation or board, or such person upon whom the writ has been personally served, has, without just excuse, refused or neglected to obey the same, the Court may, upon motion, impose a fine not exceeding $1,000. In case of persistence in a refusal of obedience, the Court may order the party to be imprisoned for a period not exceeding three months, and may make any orders necessary and proper for the complete enforcement of the writ. If a fine be imposed upon a judge *or officer who draws a salary from the State* or county, a certified copy of the order shall be forwarded to the Controller or County Treasurer, as the case may be, and the amount thereof may be retained from the salary of such

McCauley *v.* Brooks.

Judge or officer. Such Judge or officer for his willful disobedience shall also be deemed guilty of a misdemeanor in office." These sections have remained on the statute book without change since their passage in April, 1851.

We refer to these provisions of the law not as the source of authority to the District Court to issue the writ. The authority is inherent in the Court. The process is a part of that system of remedies furnished by the general principles of the common law, independent of statute, for the enforcement of private rights. We refer to the legislation to show that the doctrine advanced by the respondent has no more countenance in any action of the legislative department than it has in the action of the judicial department. We believe, too, that the doctrine was never asserted in any of the numerous applications for the writ which have come before this Court—if we except perhaps one case, that of *Nougues* v. *Douglass et al.* (7 Cal. 80). In that case the writ was asked against the Secretary of State and others, constituting Commissioners under the Act of April, 1856, for the erection of a State capitol, to compel them to draw their warrants upon the Controller in favor of the contractor; and yet at the same time, as it would appear from the opinion of Mr. Chief Justice Murray, the counsel of the relator denied the power of the Court to enforce the writ when issued. "According to the appellant's own showing," says the Chief Justice, " he has no right in Court, for he asks a mandamus to compel the Secretary of State and other officers to act in their official capacity, and at the same time denies the power of the . Court to issue any process to carry its judgments into execution. According to the argument of the appellant, if we were to decide the law under consideration constitutional, and award the mandamus, the Secretary of State might refuse to obey the order, and here would be exhibited the anomaly of a Court with jurisdiction to hear and determine, without the power of carrying its judgments into effect—*a sort of legal monstrosity that never had an existence in any civilized system of jurisprudence.* According to the same argument, the Treasurer may refuse to pay every warrant presented to him, and the holder would have no relief."

It is unnecessary to pursue this matter any further. We have, for a second time, examined this question of power in the Courts at great length, because the doctrine asserted in opposition to its. existence is fraught with the most pernicious consequences, is revolutionary in its character, and if sanctioned, will render the Government incapable of

protecting a large class of private rights. That the doctrine is unsupported by reason, and opposed by authority, we think we have abundantly established. The petition for rehearing must be denied.

It only remains to consider the application of the relators for a modification of the judgment, so that it may order the writ to issue directly from this Court, instead of being remitted to the District Court, as in the usual way. For the application, it is urged that every question involved in the case is determined, and the only effect of remanding the case to the District Court will be to interpose unnecessary and highly injurious delays in the enjoyment by the relators of their ascertained rights. In opposition to this view, it is urged that the appellate power of this Court is to be exercised with reference to the judgments of the District Court, by reversing, affirming or modifying such judgments, and that the mode and manner of enforcing its appellate power in these respects is a matter of practice, and like the manner in which appeals may be taken or suits be brought, is the proper subject of legislative control, provided the jurisdiction itself be left intact, and that by statute the judgments of this Court are to be transmitted to the District Court to be there enforced through its processes. There is a difference of opinion between the Justices deciding this case on this subject, which must result in the defeat of the application.

The petition of the respondent for rehearing, and the application of the relators for a modification of the judgment, must be denied; and it is so ordered.

BALDWIN, J., having been consulted with reference to the contract between Estill and the Board of State Prison Commissioners before going on the bench, did not sit in the case.